**INTERNATIONAL TRAVELERS' ASS'N v. DIXON. (No. 3229.)**

(Court of Civil Appeals of Texas. Texarkana. May 6, 1926.)

1. **Insurance** ⊙⇒819(4)—Evidence held to warrant finding that rupture of artery, causing paralysis, was caused solely by insured's fall in garden.

Evidence *held* to warrant finding that rupture of artery, resulting in complete paralysis, was solely, directly, and proximately caused by force of insured's fall to ground in garden while pulling weeds, though medical examination one and one-half years later showed him to have high blood pressure and enlarged heart.

2. **Insurance** ⊙⇒825(3).

Cause of complete paralysis of insured, who fell in garden, and became paralyzed an hour later, *held* question for jury.

3. **Trial** ⊙⇒260(9) — Instruction that jury should find insured's fall, which caused paralysis, to be accidental only if unusual, unexpected, and not result of physical condition held sufficient, justifying refusal of requested instruction.

Instruction that jury should find insured's fall to be accidental only if unforeseen, unusual, unexpected, and not result in whole or part of lesion in brain, illness, physical condition, or any other cause not accidental, *held* sufficient so as to justify refusal of requested instruction which did not say more.

4. **Trial** ⊙⇒351(5)—Special issue whether insured's fall was direct and proximate cause of paralysis held not affirmatively erroneous, and, in connection with another, to warrant refusal of issues whether physical condition concurred to cause paralysis.

Special issue whether fall was direct and proximate cause of paralysis *held* not affirmatively erroneous, and, in connection with issue whether fall was accidental, to warrant re-

⊙⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

fusal of issues whether insured's physical condition concurred with fall to cause paralysis.

**5. Insurance ⬥815(4)—Insured need not allege and prove levy and collection of assessments in action on contract of "fraternal benefit insurance on assessment plan."**

Insured need not allege and prove levy and collection of assessments in action on contract of "fraternal benefit insurance on assessment plan," which means that insurer's agreement to pay definite sum to insured is dependent on collection of assessments prorated to surviving members.

**6. Mandamus ⬥15—In mandamus by insured to compel levy and collection of assessments sufficient to pay full amount of policy in fraternal benefit association operating on assessment plan, defense that full amount is not available or collectible would be available.**

In mandamus by insured to compel levy and collection of assessments sufficient to pay full amount of policy in fraternal benefit association operating on assessment plan, defense that full amount is not available or collectible would be available to association.

Appeal from District Court, Harris County; Chas. E. Ashe, Judge.

Action by Thos. H. Dixon against the International Travelers' Association. Judgment for plaintiff, and defendant appeals. Affirmed.

The action is by appellee against appellant on an' accident policy issued to him by the association to recover the stipulated indemnity payable for total physical disability suffered through accidental means. The appellee alleged that—

"while he was pulling up weeds from his premises, he accidentally fell to the ground and was injured, and that he immediately arose and hobbled into his house, and immediately thereafter, as a result of said fall and the injuries received therefrom, independently and exclusively of all other causes, he became paralyzed to such an extent as to render him unable to talk, walk, use his hands, or write, and disabled from performing any and every kind of duty pertaining to his occupation. That he has continuously since that date up to the present time been totally disabled from performing any and every kind of duty pertaining to his occupation."

The policy provided "against loss resulting from bodily injuries effected directly, independently, and exclusively of all other causes through accidental means." It provided for payment to appellee of indemnity for total physical disability "of $25 a week so long as he lives and suffers such total disability from performing any and every kind of duty pertaining to his occupation."

The appellant filed a demurrer and general denial, and specially pleaded that it was a mutual assessment accident insurance association, duly incorporated under the statute of Texas; that it has no capital stock; and that its revenues are derived entirely from assessments upon its members.

The evidence is without dispute that the appellee sustained a fall while cleaning out the weeds in his garden on the late afternoon of May 21, 1923. The evidence is also without conflict that the appellee became completely paralyzed on one lateral side of the body, the right side, face, arm, and leg, about "an hour or an hour and a half" after he fell in the garden and that he was in that same permanent condition at the time of the trial on January 25, 1925. It is admittedly shown that the rupture of "a blood vessel" produced the paralysis. Therefore, permanent "bodily injuries" were shown to have been produced by a rupture of a blood vessel. The issue of fact was that of by what means was the rupture brought about. It was shown that the appellee for 8 or 9 years before the date of the injury in suit was an insurance agent; that he was 56 years old; that he was active and energetic in his work, and in apparent good health, though "he never was very robust," to the time of the injury. The injury occurred as follows, as shown by the appellee's evidence:

"On May 21, 1923, I sustained an accident. I was working in my garden at the time, about 6 o'clock p. m. I was pulling up weeds in the garden. After eating my supper, I went into the garden, saw the weeds, and began to pull them. The onions there were pretty well taken with weeds. The onions were in cultivated ground. The weeds were pretty hard to get up, and, while pulling on the weeds, one gave way, came up, and I then fell backwards with all my force. I hit the ground on my right side. I felt a hurt in the side of my head and all along the side and down in the leg. I was unconscious—stunned—for a little while. As soon as I regained consciousness I went into the kitchen, got a drink of water, bathed my face, and got the dirt off both of my hands. I took a seat in the corner of the kitchen. My wife came in, and I sat there. In an hour and a half, I suppose, after that I became paralyzed. I was in very much pain before. I fainted, and fell over, and I never regained consciousness for 2 or 3 days afterwards."

A neighbor of appellee "saw Mr. Dixon pulling at something in the garden, and saw him fall backwards, and then get up and limp towards the house." That is the evidence concerning the fall and the manner in which it happened. The appellee further testified:

"Up to the time of the accident I was in perfect health. Since the accident I have not been able to do anything. I can't even walk. Prior to that time I had never had the slightest touch of paralysis or anything of the kind. I never had any idea of it. I never felt any pain or any queer feeling at all until after I pulled the weed and fell to the ground. It was just about 15 minutes before that time that I had eaten my supper. I never felt anything queer or out of the ordinary before I hit the ground. I never had medical attention of any kind during

---

⬥For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the weeks or months preceding the accident. I never had my blood pressure taken or kidneys examined. I had not had a doctor prescribe for me for anything except for a slight attack of 'flu' about 3 or 4 months before. I did not take any medicine for it. I never had my urine examined in the last year or two because I had no occasion to do so."

In November, 1924, and after the suit was filed in April, 1924, two physicians together made an examination of appellee. No medical examination appears to have been made prior to this date. They say he was completely paralyzed on the right side, face, arm, and leg, and that it was a condition permanent to a fatal ending One of the physicians offered as a witness by appellee testified:

"I arrived at a conclusion as to the cause of his condition, * * * assuming the hypothetical question asked me (being the facts testified to by appellee) to be true, I would say the cause of his paralysis was the trauma occasioned by the fall, the sudden impact with the ground. * * * There are other things that would cause a man of his age to fall. Apoplexy would cause it. A brain lesion resulting from the condition of arteries at his age would cause it. I made an examination of his arteries, and found that he was suffering with arteriosclerosis, or hardening of the arteries. A man suffering with brittle arteries is likely to enjoy perfect health, performing the ordinary duties of his life without any inconvenience, and then perform a duty that he had not been accustomed to do and rupture one of the small vessels of the brain. When I examined him he had a blood pressure over 180—about 145 would have been normal at his age. I would naturally think that slow, gradual hardening of his vessels had been taking place, as it does in all of us. He gave me the history of the accident—that he first tried to pull the weed out and it didn't come, and that he jerked harder and harder, and it finally gave way under a very hard jerk, and he suddenly fell. The exertion of making three or four pulls at the weed would jump up his blood pressure several points; then to unexpectedly fall, together with the impact against the ground, was a sufficient force to jump it up further, and through the direct blow of the fall rupture a vessel. * * * He stated that he fell, got up, and walked into the house. That fact alone shows that the rupture took place after the fall to the ground, and that the rupture was not the cause of the fall, because when a blood vessel ruptures and a person has a stroke he falls from that and is immediately paralyzed. Such a fall as stated might not affect a man who is in good physical condition, and it might not affect a man who is not in good condition. It is not a mathematical proposition. * * * If the rupture had taken place before the fall, and was of such violence to cause a fall, in my opinion he could not have gotten up and walked into the house and sat around for half an hour or more. If he had 'a slow leak' for some time prior to the fall, and it grew so as to cause a fall, he would have felt its effects prior to the time he fell, such as a headache or swimming at the head or dizziness. From the history of the case, as I have it, it is my opinion that the fall caused the rupture, and not the rupture that caused the fall."

The other physician, offered as a witness by appellant, testified:

"We found Mr. Dixon paralyzed on the right side. I found that Mr. Dixon's heart was enlarged. I also found arteriosclerosis was present. I could not tell whether that was recent or whether it had existed for some time. I know that it takes time to get into such condition. It does not come just overnight. When the hardening of the blood vessels has reached a certain extent, and the blood pressure is high the rupture usually comes in the brain, with the result of paralysis. A rupture, when a person is in that condition, does not come solely from trauma, or wound or shock, but it may occur at any time; it may occur in sleep. The eating of a heavy meal and then using muscular exercise or exertion usually raises and creates greater pressure on the weakened arteries. There is no fixed time when such afflicted person would fall from rupture; it would depend on where the rupture occurred and on the size of the rupture. The 'jump off' is liable to happen at night, and it is liable to come at any time and under any condition. In a small rupture and a slow leakage the affected person could walk ten minutes, or a half hour, even an hour. It would depend upon the size of the clot and its location. If a man affected as Mr. Dixon appeared was working in the garden in cultivated ground, and, pulling up weeds, fell, and later got up and went into the house, and his condition continued to get worse until he became totally paralyzed on the right side, I would say that the fall was the result of the lesion in his brain. It is my opinion that a healthy person by pulling weeds in cultivated ground could not bring on the condition I found Mr. Dixon in when I examined him merely from a fall on the cultivated ground. It is my opinion that the condition of his veins antedated the fall. * * * If he had a rupture resulting in a slow leak for half an hour or an hour before falling, I think he would feel the effects before falling of a dizzy feeling, headache, or something of that kind. If the leak was so violent as to cause a fall, he might be able to get up and walk in the house; it is possible, but not usual. * * * Men frequently live for years with high blood pressure. * * * In my opinion, from the statement about his pulling the weeds, such a fall in a well person would not bring on the condition as in Mr. Dixon's case. I do not think such a fall would bring on that condition. A light fall would bring on serious results, but we don't expect that. I do not think a light fall, a little distance with little force, would cause an artery to break."

The case was submitted to the jury on special issues. They made the findings (1) that "the fall" was occasioned by "something unforeseen, unusual, and unexpected," and was in no wise "the result in whole or in part of a lesion in the brain, illness, or physical condition of plaintiff, or (due to) any other cause than an accident alone," and (2) that "the fall" was "the direct and proximate cause of the paralysis with which the plaintiff is now suffering." Therefore, the verdict of the jury, having evidence to warrant it, settled the fact that the rupture of the blood vessel, producing the paralysis at the time it happened,

was directly and immediately caused through accidental means, the force of the fall to the ground, and through no other cause. In keeping with the verdict, the court entered judgment for the plaintiff in the case.

Seay, Seay, Malone & Lipscomb, of Dallas, and Hunt & Teagle, of Houston, for appellant.

Woods, King & John, of Houston, for appellee.

LEVY, J. (after stating the facts as above), [1] The appellant contends that the findings of the jury are contrary to the evidence. It is argued that the circumstances show that the paralysis of appellee was due to the very high state of blood pressure he had been previously suffering from, and that it was not caused solely and exclusively by any purely accidental fall to the ground. It is thought that the evidence is sufficient to warrant the jury in finding on the general issue, as in effect they did, that the rupture of the artery, resulting in complete paralysis, was directly and proximately caused by the force of the fall to the ground, and that the force of the fall was the sole emanative cause of such rupture at the time it occurred. It is admittedly shown that the paralysis was due to the rupture of an artery acting on the brain. Under the circumstances as described by the appellee, who was the only witness testifying in that particular, it appears that the appellee was pulling up the weeds in an onion bed. A particular weed was so rooted as to be difficult to pull it loose from the ground, and the appellee gave it a very hard jerk or pull. The weed responded to the hard jerk, giving way all at once, and upon that happening the appellee was overbalanced, and immediately fell backwards, striking the ground full length of the body on his right side, "with all my force." Appellee at once felt an injury or hurt. He says:

"I felt a hurt in the side of my head and all along the side and down in the leg. I was unconscious—stunned—for a little while."

Consequently it is strongly inferable that appellee's body hit the ground with force. Upon regaining consciousness, he "went into the kitchen," sat down, and continued to suffer "very much pain." In "an hour or an hour and a half" after the fall complete paralysis of the entire right side resulted. The physician said:

"In a small rupture or a slow leakage, the person affected could walk ten minutes, half an hour or even an hour."

It does not appear impossible, or even improbable, that an injury such as rupture of an artery could have resulted from a fall in the manner related. The physician said:

"The sudden fall and impact with the earth was sufficient trauma (violence) to rupture the blood vessel."

And the testimony is sufficient to indicate that a severe injury did in fact result from the fall. There was complete and permanent paralysis of the entire right side following in an hour or an hour and a half after the moment of the fall. According to the appellee's evidence, he "was in perfect health" prior "to the time of the accident." Before the moment of the fall, appellee "never felt any pain or anything queer or out of the ordinary." He led an active, energetic life in his occupation of insurance agent. These matters would go to negative an inference of the breaking of the artery before the moment of the fall, or that the breaking of an artery "caused the fall" to the ground. And the expert opinion of the physician would corroborate such conclusion. The physician said:

"He stated that he fell, got up, and walked into the house. That fact alone shows that the rupture took place after the fall to the ground, and that the rupture was not the cause of the fall, because, when a blood vessel ruptures, and a person has a stroke, he falls from that, and is immediately paralyzed. If the rupture had taken place before the fall, and was of such violence as to produce a fall, in my opinion he could not have gotten up and walked into the house and sat around for half an hour or more. From the history of the case, as I have it, it is my opinion that the fall caused the rupture, and not the rupture that caused the fall."

The other physician testified, it is true, that—

"It is my opinion that a healthy person by pulling weeds in cultivated ground could not bring on the condition of Mr. Dixon merely from a fall on the cultivated ground. A light fall would bring on serious results, but we don't expect that. I do not think a light fall, a little distance with little force, would cause an artery to break."

The force of such testimony entirely depends upon the weight to be attached to it by the jury. The two phyicians made a physical examination of appellee a year and a half after the fall. Their only knowledge of the facts was gained at this examination. At that time the physicians found appellee suffering from a high state of blood pressure and also an enlarged heart. There is no direct evidence that the appellee had a high progressive state of blood pressure or enlarged heart at the time of the fall. The physicians merely gave it as their opinion that "the condition of his veins antedated the fall." It might have existed in a high degree or a greatly less state. The physicians were only undertaking to show a possibility or probability of appellee's condition from "a stroke of paralysis" arising through high blood pressure. But, all the evidence considered, the appellee's as well as the physicians'. the conclusion is permissible to the jury that the hardening of the appellee's arteries, if existing to any degree through blood pres sure, was not at the time of the fall in an ex

treme or high state of danger. They could at least say that it was not to an active state of danger. The whole evidence is not entirely consistent with the long-continued presence of a malignant and active high state of blood pressure before and at the time of the fall. One of the physicians testified that, even if appellee had suffered, but which was not affirmed to be a fact, "a slow leak of the artery for some time prior to the fall, and it grew so as to cause a fall, he would have felt its effects prior to the time he fell, such as headache or swimming of the head or dizziness." The other physician said the same thing. But appellee says he had none of those symptoms or warnings. He said:

"I never felt any pain or anything queer at all or out of the ordinary before I hit the ground."

[2] And the physicians merely stated that "a slow leak" was a probability, likely to happen as an occurrence in case the person had a high active state of blood pressure. The evidence does not present a case of an entirely unexplained injury, where the cause of it is wholly conjectural. The whole general issue was a matter for the jury, and their finding that the rupture of the artery would not have occurred at the time it did but for the force of the fall is not contrary to the evidence so far as to justify this court to disturb the verdict. It is made reasonably plain that the immediate cause of the rupture was the force of the fall to the ground, resulting from being overbalanced in pulling up the particular weed. It may have been that appellee had a pre-existing disease, rendering him more susceptible to paralysis from such violent force than he otherwise would have been, but the mere presence of such condition does not relieve against liability for the accident.

[3] The court submitted the following issues to the jury:

"(1) Did the plaintiff, Thomas H. Dixon, on or about May 21, 1923, receive a fall?

"(2) If you answer special issue No. 1 'Yes,' only in that event, you will answer this question: Was such fall accidental? Answer 'Yes' or 'No,' as you may find. In connection with this special issue No. 2, you are instructed that the word 'accidental' means something unforeseen, unusual, and unexpected. If the fall was the result, in whole or in part, of a lesion in the brain, illness, or physical condition of plaintiff, or any other cause than an accidental one, you will answer special issue No. 2 'No.'"

The appellant made timely exception to the issues. As to No. 2, the exception was that—

"The same is too restricted, in that it does not require a finding by the jury as to the cause of the fall or whether the same concurred with a disease or bad physical condition of the plaintiff at that time, and does not submit the true issue in the case."

The following instruction was then requested and was refused by the court:

"You are instructed that by the term 'directly, independently, and exclusively of all other causes' is meant that the plaintiff's paralysis, if any, must have occurred or been caused directly and proximately from the fall in his garden, and that no other efficient cause, such as disease, must have directly and proximately contributed thereto. If you do not believe from the preponderance of the testimony that the fall of Mr. Dixon in the garden on the occasion in question resulted directly, independently, and exclusively of all other means, in the stroke of paralysis on May 21, 1923, then it will be your duty to answer No. 2 'No.'"

It is believed that special issue No. 2, as submitted by the court, is not erroneous or misleading or too restrictive of the general issue. The jury in the instant case could plainly understand that they were called upon to decide from the evidence whether or not "the fall" of the appellee was due directly and exclusively to accidental means. The jury were informed first that the word "accidental," as used and intended to be understood, meant "something unforeseen, unusual, and unexpected"; that is, an occurrence without appellee's foresight or expectation. Such definition of the term is substantially the same as approved in Robinson v. Ins. Co. (Tex. Com. App.) 276 S. W. 900. But the court went further, and explicitly stated to the jury that "the fall" would in no wise be deemed to be through accidental means in case it was "the result, in whole or in part, of a lesion of the brain, an illness, or other physical condition of plaintiff, or any other cause than the accident alone." The matters laid before the jury to be excluded covered the entire circumstances shown in the evidence; the rupture of an artery or "a lesion of the brain"; the previous temporary "illness" of appellee; or any "physical condition"; or high blood pressure. Even further, "any other cause than the accident alone." None of these things, the court in effect told the jury, must either be the cause or a contributory aid or influence of "the fall" to the ground; that the fall must have been caused by "the accident alone." The instruction requested and refused did not say more than the court's instruction. As an admitted fact, the paralysis was due to the rupture of an artery or "blood vessel," acting injuriously on the brain of appellee. The controversy in the trial was entirely concerning whether, in the circumstances, the rupture of the artery occurred before and brought about "the fall" of appellee and the complete paralysis of the side that followed shortly afterwards, or whether "the fall" in the manner it occurred solely caused the rupture, which produced the paralysis that followed shortly afterwards. Of course, if a ruptured artery occurred, and it brought about "the fall" to the ground, and

the complete paralysis shortly afterwards, "the fall," as well as the complete paralysis that followed afterwards, would be from natural cause, and not from an "accidental" one, in the meaning of the policy. But, if the means directly and proximately producing the ruptured artery was the force of "the unforeseen, unusual, and unexpected" fall to the ground, then the appellee suffered "bodily injuries" which were "effected directly, independently, and exclusively of all other causes, through accidental means," in the meaning of the policy: Pledger v. Accident Ass'n (Tex. Com. App.) 228 S. W. 110; Accident Co. v. Miller (Tex. Civ. App.) 193 S. W. 750.

[4] The court next submitted the following issue:

"(3) If you have answered issues 1 and 2 'Yes,' and in that event only, you will answer: Was the fall the direct and proximate cause of the paralysis with which the plaintiff is now suffering? Answer 'Yes' or 'No' as you may find."

Timely exception was made to the charge, upon the ground that it did not authorize the jury to consider or find that the disease contributed or concurred in causing the appellee to fall. In the light of the previous issue, No. 2, upon which this third issue was predicated, the issue complained of is not affirmatively erroneous or subject to the objection urged. The issue, in effect, asked the jury to find whether or not "the fall," meaning, and expressly referring to, "the accidental fall," such as was specially defined to exclude the matters stated, was "the direct," not indirect, and "proximate," or immediate, "cause" of the breaking of the artery producing the complete paralysis of appellee's side. The previous instruction very strongly told the jury to exclude disease of "any other cause" in determining "accidental fall." Therefore, the jury could plainly understand that they were called upon to decide only that "the accidental fall," excluding disease or any other cause, was the direct and immediate cause producing the paralysis. The jury could have the conception of a "cause," as defined by the court, as producing the effect itself without reference to any other cause.

The appellant separately requested the following questions, and they were both refused by the court:

"Did or did not the pulling of the weeds and his fall, if you find he did fall, at that time, concur with his prior physical condition to produce the paralysis with which he is now suffering?"

And

"Would the fall sustained by plaintiff, if you find he did fall as alleged by him, have produced his present condition, except for his prior physical condition?"

Aside from any question of the instructions being on the weight of the evidence, as as-suming a high state of blood pressure or hardened arteries at the time of the fall, the issues and instructions as given by the court covered substantially and affirmatively all that was presented by these instructions, as far as allowable under the policy as a defense against liability. The instructions were apparently predicated upon the conclusion that no liability existed in case the appellee was suffering from a pre-existing disease, rendering him more susceptible to paralysis from violent external force than he otherwise would have been. There is no such stipulation in the policy that, although an injury be directly and proximately caused through purely accidental means, such as force or a blow, yet, if such accidental force or blow operates to aggravate or accelerate, or so far seriously affect a pre-existing bodily disorder or disease beyond what it would have been but for such accidental force or blow, no liability exists therefor. The correct interpretation and meaning of the stipulation contained in the policy is that the association will be liable in case the purely accidental means solely produced the injury at the very time it occurred (which injury in this case was the rupture of a blood vessel), even though pre-existing bodily infirmity (which in this case was hardened arteries) rendered the insured more susceptible to bodily injuries than he otherwise would have been. Otherwise the policy would apply only to a person in perfectly sound body and health, and such intention is not evident from the face of the contract. Pledger v. Accident Ass'n (Tex. Com. App.) 228 S. W. 110; Fidelity & Casualty Co. v. Meyer, 152 S. W. 995, 106 Ark. 91, 44 L. R. A. (N. S.) 493; Penn v. Ins. Co., 73 S. E. 99, 158 N. C. 29, 42 L. R. A. (N. S.) 593; Bohaker v. Travellers' Ins. Co., 102 N. E. 342, 215 Mass. 32, 46 L. R. A. (N. S.) 543. The cases cited by appellant pass upon a very different question. Casualty Co. v. Glass, 67 S. W. 1062, 29 Tex. Civ. App. 159; Indemnity Co. v. MacKechnie (Tex. Civ. App.) 185 S. W. 615. In the Glass Case, supra, the question was merely whether appendicitis or the anesthetic administered by a physician was "proximately the sole cause" producing, in the first instance, the injury. The cause of the death was merely conjectural, and it was necessary to determine whether or not the appendicitis or violence of it alone was the direct emanative cause of the injury, which in that case was death. The material inquiry in the MacKechnie Case, supra, was "whether the fall he suffered in attempting to catch the street car" caused the rupture of a blood vessel, resulting in permanent paralysis. No more was involved in the ruling than whether or not the force of the fall alone directly and immediately caused the rupture at the time it happened. The charge on the "burden of proof" as given by the court was sufficient.

[5, 6] The appellant predicates error upon

the failure to allege and prove the levying and collection of assessments by the company. It is argued that the appellant is a mutual assessment company incorporated under the statutes, and that payment of the benefit herein is conditioned upon its being collected from assessments of the members of the company. A contract of purely fraternal benefit insurance upon the assessment plan means that, even though the agreement is to pay a definite sum, yet such sum is dependent upon the actual collection of such assessments prorated to all the surviving members as may be necessary for paying the amount. The members cannot be held individually liable for the whole debt, or for more than their legal assessable amount. The point made pertains merely to a defense, in a suit to enforce collection by requiring assessments to be made, that the full amount assumed to be paid·is not available or collectible from the membership after due levy and collection of all assessments upon the members which are authorized and allowable by the laws of the association. In other words, in a mandamus to compel the levy or collection of sufficient assessments to pay the full amount of the policy, such defense, as stated, would be available to the association as a remedy. In the above ruling it is assumed that the Association should be classed as a purely fraternal benefit, and not a co-operative assessment association.

The judgment is affirmed.