**HARTFORD ACCIDENT & INDEMNITY CO.**

v.

**DOUGLASS.**

No. 14766.

United States Court of Appeals,
Fifth Circuit.

Aug. 12, 1954.

Rehearing Denied Oct. 6, 1954.

Howard Barker, Cantey, Hanger, Johnson, Scarborough & Gooch, Ed Reichelt, Fort Worth, Tex., for appellant.

F. Bert Walker, Richard F. Martin, Aubrey G. Alexander, Alexander & Martin, Thompson, Walker, Smith & Shannon, Fort Worth, Tex., for appellee, Alcyone Ross Douglass.

Before STRUM, Circuit Judge, and DAWKINS and HOOPER, District Judges.

DAWKINS, District Judge.

Defendant below appeals from a judgment for the appellee on an accident insurance policy dated January 10, 1917, insuring the husband, F. A. Douglass, against death "caused directly and exclusively by bodily injury sustained, solely and independently of all other causes, through *accidental means*" (emphasis added). Appellee was named as the beneficiary and Douglass died December 20, 1951. On that day Mrs. Douglass brought home a crate of grapefruit in a station wagon and Mr. Douglass arrived sometime later. About 6:30 p. m., they had a highball, followed by a heavy meal, and, at approximately 9:00 o'clock, a friend, Mr. Davidson, came for a visit. As he prepared to leave shortly before 10:00 o'clock, Mrs. Douglass suggested he take some of the grapefruit, which was still in the station wagon. The three started for the garage, but Mrs. Douglass and Davidson stopped momentarily discussing something of mutual interest, and when they reached the garage the crate, weighing some 80 to 90 pounds, was on the floor. **Mr.**

Douglass was standing upright beside it and as they entered, said: "That crate was the biggest I ever got hold of" or "the heaviest I have ever lifted".

The weather was quite cold, Davidson's car would not start, and Douglass,

in his station wagon, pushed it for some distance. Davidson gave his version as to what happened as a witness for appellee.[1]

As soon as Douglass had been returned to his home, the family physician, Dr.

---

1. Testimony of J. Browner Davidson—R. 22.

"Q. When you got out there, did you see a crate of grapefruit? A. I did.

"Q. Where was the crate of grapefruit when you got out there? A. On the floor.

"Q. On the floor of the garage? A. On the floor of the garage.

"Q. Go ahead. A. Between the two cars.

"Q. Okay. Go ahead and state what then happened? A. When I got there Mr. Douglass was standing there, and he said, 'That was the biggest crate of grapefruit I ever got hold of.'

"Q. Go ahead. A. I leaned down and commenced to investigate it, and asked him for a pair of pliers, and he turned around and got a pair of pliers out of the compartment of his car and handed them to me. I took the grapefruit out, opened the crate and asked for a basket, and he turned around and handed me a wicker basket and I put the grapefruit in it.

"Q. Go ahead and detail right on through. A. Then I carried the grapefruit out and put it in my car and got in the car and tried to start it and it wouldn't start.

"Q. Where was Mr. Douglass at that time? A. He had walked out to the side of my car.

"Q. Go ahead. A. The car wouldn't start, so we went back in the house, it was very cold, and we stayed there probably five minutes, I don't know exactly, and went back out, and still my car wouldn't start, so he said he would take his car and push me. So, he took his car out of the garage and then went up back of me and turned around and got his front bumper to my rear bumper and started pushing me, pushing me on up toward the highway, and when we got there we didn't have enough momentum, so he backed off and I cut off and rolled back, then he got a better push and we got up on the highway, and he pushed me on."

\*　　\*　　\*　　\*　　\*　　\*

"Q. Go ahead. A. When he would get to me, he would give me a shove, sometimes he would stay close and sometimes he wouldn't, it looked like he was waiting to see if mine was going to fire. I hit one place down there, a culvert rise, and he

hit me pretty hard there. We went on around a curve, and I was going fast enough I got quite a ways then, but I couldn't make the top of the hill, then he came up closer to me and begun blowing his horn and I got out of the car and went back because he rolled up close to me, and I asked him what was the trouble.

"He said, 'I am hurt, take me somewhere quick.'"

\*　　\*　　\*　　\*　　\*　　\*

"Q. What did you do then? A. I got out of the car and went around to help him out of the car.

"Q. Now, I will ask you another question: Had he, from that statement he made—when you went back—first went back to his car, did he say anything else from then up until the time you stopped the car at their garage? A. He didn't say anything to me. I didn't hear him say anything. He was just groaning."

\*　　\*　　\*　　\*　　\*　　\*

"Q. Now, I will ask you this: Whether or not soon after this accident you discovered anything wrong with your car? A. A day or two later I discovered the plate across the back of the trunk lid was broken."

The witness stated the damage to the rear of his own car was not there when he washed it a day or two earlier.

"Q. Had you any jolt or jar that might have broken it? A. I hadn't had any, unless it was when he hit me that night down there with his car at that little rise over that culvert."

He didn't notice the damage for "a couple of days" and had no bumps he could recall in the meantime. Davidson further testified he had known Douglass intimately and that he "was very active" and had had no illness of consequence the witness knew about.　\*　\*　\*　\*　\*

"Q. Can you approximate the time that intervened between the time that you went out and found Mr. Douglass standing by the crate of grapefruit there and the time when you went back to his car when you were on Roberts Cut Off?"

\*　　\*　　\*　　\*　　\*　　\*

"A. Well, I don't know. It may have been 20, maybe 20 to 30 minutes."

\*　　\*　　\*　　\*　　\*　　\*

"Q. I will ask you, did you see any actions of his hand or his hands, or any other parts of his body, after you brought

Barcus, was called and arrived in about 15 minutes. The pertinent parts of his testimony appear in footnote.[2]

Doctor Barcus stated Douglass had no previous history of heart disease and gave it as his opinion the rupture was caused by the strain of lifting the grapefruit. In responding to the call this doctor took with him his brother-in-law who lived in the former's home, Dr. White, who agreed with Barcus that death was caused by rupture of the aorta.

In the death certificate Dr. Barcus reported that deceased was manually pushing Davidson's car from the ground or street, but later learned he was using the station wagon. The doctor then concluded that the death had been caused by lifting the crate to the floor of the garage. He conceded that the blood vessels could have ruptured and caused death even while deceased was sitting in a chair and that such vessels grow weaker with age. Mr. Douglass was somewhere between 63 and 65 years of age. Dr. Barcus recommended an autopsy but Mrs. Douglass refused and the body was cremated. This witness further stated there were no marks of physical injury on the body. This completed the medical testimony on behalf of appellee.

Dr. Andujar, who qualified as an expert, testified on behalf of appellant, expressing the opinion that Douglass was suffering from arterial sclerosis when the accident happened.

The vital question before the lower court and here is the meaning of the phrase "through accidental means" as distinguished from "accidental death". There was no visible evidence of any injury on the body of deceased, or that the crate of grapefruit had slipped or fallen, causing him to grab it in an unusual manner or that it had struck the deceased, or that anything else had happened out of the ordinary. Apparently the injury was caused by the strain of

---

him back to the house? A. Well, in the car, when I got in the car with him, he had his hand up like this, over his heart, and he kept breathing very heavy and groaning, and he was laying kind of back there toward the edge of the post of the car and kept his hands up there" (indicating.)

2. Testimony of Dr. W. S. Barcus—R. 84.
"Q. Now, Dr. Barcus, since you have been Mr. Douglass' family doctor, have you ever attended him for any serious disease, what you would call a serious disease, prior to his last illness? A. No, he never had a serious disease. He was operated on for a hernia. At one time he had a little hemorrhage from his urinary tract, but neither one of them were serious in any sense."

He stated Douglass was about 5'10" tall and weighed about 150 or 155 pounds, with little or no variation, and, if Mr. Douglass had had any other infirmities, being his doctor and close friend, the witness said he would have known it. He had not examined deceased for some time but had no reason to think there had been any change in his health. Witness played golf, fished and tramped with Douglass and "never saw him tired out."

Dr. Barcus reached the Douglass residence about 10:00 P. M., or about 15 minutes after he was called.
"Q. Well then, Doctor, state the condition you found Mr. Douglass in when you arrived at his home? A. He was sitting in a chair, and slumped over in a chair, and appeared extremely,—as I say—looked like he was going to die any minute. He was unconscious, he looked as if he would die any minute."

Dr. Barcus went with Douglass in the ambulance to the hospital and stayed with him until he died, shortly before midnight.
"Q. What, Doctor, was your diagnosis as to the cause of his death? A. My diagnosis was that it was rupture of the intima of the aorta and occlusion of the aorta passage on each side the neck.
"Q. Breaking that down, explain to the jury in detail what you are talking about? A. Well, the intima or aorta is the big vessel that comes from the heart, and the correlated vessels come off of the aorta, one on each side to supply the brain. The intima is actually the lining tissue of that vessel.
"Q. Inner lining? A. The lining, yes, sir, inner lining of the aorta. And the aneurism means swelling, means that the blood got behind that inner lining which we call the intima and pushed it away from the wall of the vessel. When it did that, it carried along the course of the aorta where it came to where the aorta came off, and no blood could go through there. Later that same thing happened to his left aorta."

lifting the 80 to 90-pound crate from the station wagon to the floor of the garage. The only other possibility was the effort to get Davidson's car started, but the doctors apparently attached little or no weight to that incident. In any event, it would appear that both acts were voluntarily and intentionally done.

The question thus presented appears to have caused more confusion in the jurisprudence than would be expected. There is also great divergence in the decisions throughout the country, including the State of Texas, where the present case arose. There are likewise variations in the wording of policies which generally conclude with the phrase "accidental means". In some the expression is substantially as used in the present case, whereas in others, the words "external" and "violent" are included, but there is little indication that the courts have given much consideration to these differences. At times it would appear that some courts rely on the rule that since the language was chosen by the insurer, it should be construed more strongly against it. Some have reached their conclusions "by a hair", while others followed suit where the head was entirely bald.

In the early case of United States Mutual Accident Association v. Barry, 131 U.S. 100, 9 S.Ct. 755, 758, 33 L.Ed. 60 (decided in 1889), three doctors, after visiting a patient near-by, were returning to a drug store, and to save time, took a short cut by way of an elevated platform. Apparently there were no steps to descend and they each jumped the four or five feet to the ground. The first two physicians made it all right, but the third had his duodenum ruptured and

died. The latter carried a policy with the appellant in that case insuring against death from " 'bodily injuries alone, effected through *external, violent, and accidental means* ' ". (Emphasis supplied.) The appeal was from a verdict and judgment in favor of the appellee beneficiary and the alleged error was as to the charge to the jury by the trial court.

The deceased was a young man 31 years old, about six feet tall, weighing between 160 and 175 pounds and "was in good health". One of the two doctors testified:

" 'Just after we had jumped, Dr. Barry jumped, and he came down so heavy that it attracted our attention, and we both turned around, and we both remarked that it was a heavy jump, and I asked him, "Doctor, are you hurt?" and he said, "No; not much." I have an indistinct recollection of his leaning against the platform when he jumped, but not sufficiently to state positively. If I were to jump I would jump and strike on my toes, and, if I had any distance to jump, would allow my knees to give. The way Dr. Barry came down, it sounded to us as if he came down solid, on his heels, so much so that we both turned around and remarked, "Doctor, you came down heavily." And I asked him, "Are you hurt?" and he said, "No; not much." I heard the noise. It was a singular jump, and sounded like an inert body. We then went with him to the drug store.' " 131 U.S. 104, 9 S.Ct. 757.

The pertinent parts of the charge are quoted in footnote.[3]

3.  131 U.S. 109, 9 S.Ct. 759.
    " 'If you find that injury was sustained, then the next question is: Was it effected through external, violent, and accidental means? This is a pivotal point in the case, and therefore vitally important. The means must have been external, violent, and accidental. Did an accident occur in the means through which the alleged bodily injury was effected?
    "('The jumping off the platform was

the means by which the injury, if any was sustained, was caused.)
    "('Now, was there anything *accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground?)*
    "('The term "accidental" is here used in its ordinary, popular sense, and in that sense it means "happening by chance; unexpectedly taking place; not

In disposing of the exception to the charge, the Supreme Court said:

"3. It is further urged that there was no evidence to support the verdict, because no accident was shown. We do not concur in this view. The two companions of the deceased jumped from the same platform, at the same time and place, and alighted safely. It must be presumed, not only that the deceased intended to alight safely, but thought that he would. The jury were, on all the evidence, at liberty to say that it was an accident that he did not. *The court properly instructed them that the jumping off the platform was the means by which the injury, if any was sustained, was caused; that the question was whether there was anything accidental, unforeseen, involuntary, unexpected, in the act of jumping, from the time the deceased left the platform until he alighted on the ground; that the term 'accidental' was used in the policy in its ordinary, popular sense, as meaning 'happening by chance, unexpectedly taking place, not according to the usual course of things, or not as expected;' that, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs which produces the injury, then the injury has resulted through accidental means. The jury were further told—no exception being taken—that in considering the case they ought not to adopt theories*

according to the usual course of things;" or not as expected.)

"('*In other words, if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, then, I suppose, it cannot be called a result effected by accidental means.*)

"('*But if in the act which precedes the injury something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted from the accident, or through accidental means.*)

"('*We understand from the testimony, without question, that the deceased jumped from the platform with his eyes open, for his own convenience, in the free exercise of his choice, and not from any perilous necessity. He encountered no obstacle in jumping, and he alighted on the ground in an erect posture.* So far we proceed without difficulty; but you must go further and inquire, *and here is the precise point on which the question turns: Was there or not any unexpected or unforeseen or involuntary movement of the body, from the time Dr. Barry left the platform until he reached the ground, or in the act of alighting? Did he or not alight on the ground just as he intended to do? Did he accomplish just what he intended to, in the way he intended to? Did he or not unexpectedly lose or relax his self-control, in his downward movement? Did his feet strike the ground as he intended or expected, or did they not? Did he or not miscalculate the distance, and was there or not any involuntary turning of the body in the downward movement, or in the act of alighting on the ground? These are points directly pertinent to the question in hand.*)

" 'And I instruct you that if Dr. Barry jumped from the platform and alighted on the ground in the way he intended to do, and nothing unforeseen, unexpected, or involuntary occurred, changing or affecting the downward movement of his body as he expected, or would naturally expect, *such a movement to be made, or causing him to strike the ground in any different way or position from that which he anticipated or would naturally anticipate, then any resulting injury was not effected through any accidental means. (But if, in jumping or alighting on the ground there occurred, from any cause, any unforeseen or involuntary movement, turn, or strain of the body, which brought about the alleged injury, or if there occurred any unforeseen circumstance which interfered with or changed such a downward movement as he expected to make, or as it would be natural to expect, under such circumstances, and as caused him to alight on the ground in a different position or way from that which he intended or expected, and injury thereby resulted, then the injury would be attributable to accidental means.)*' " (Emphasis added.)

*without proof, or substitute bare possibility for positive evidence of facts testified to by credible witnesses; that where the weight of credible testimony proved the existence of a fact, it should be accepted as a fact in the case; but that where, if at all, proof was wanting, and the deficiency remained throughout the case, the allegation of fact should not be deemed established."* 131 U.S. 121, 9 S.Ct. 762. (Emphasis supplied.)

Many, many cases have been cited, some of which involve only accidental death and others involved death by "accidental means".

In Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S.W. 673, 674, L.R.A. 1916E, 945, involving a sunstroke, the Supreme Court of Texas (in 1916) quoted with approval much of the above language from the Barry case. The pertinent expression was a rather long and involved clause of the policy that the insurer would be liable for injury or death " 'which is effected directly and independently of all other causes through external, violent and purely accidental means * * *' ". After the quotation from the Barry case, the Texas Court said:

"Upon the admitted facts, was the sunstroke suffered by Perry, the assured, under this clearly stated general rule, an accident? It was, undoubtedly. He was at the time walking the streets in the ordinary way, unconscious of any danger from the heat of the sun, as is to be plainly inferred from the stated facts, with apparently no apprehension of injury from that source, and a sunstroke suddenly befell him. *True, his exposure to the sun was voluntary. But that does not conclude the question. Though the exposure be regarded as 'the means' of his injury,—to our minds an erroneous view,—and as purely voluntary, it cannot be said that the result was one following 'in a not unusual or unexpected way' from such* means. *On the contrary, in the course of the exposure, the act immediately preceding the injury, the sudden prostration occurred, not the usual happening under such circumstances in common experience, but having forcibly in its event the elements of 'something unforeseen, unexpected,' and out of the ordinary course.*

"In the Barry Case, the jump of the assured, which constituted the act immediately preceding his injury and occasioned it, was likewise voluntary and intentional. It was 'the means' of the injury. But the court repudiated the proposition that because of its having been voluntary, the resulting injury could not be regarded as due to an accident. It was held to have been an accident, notwithstanding the voluntary nature of the act which caused it, for the reason that it was an unforeseen result, following, not naturally from the act, but in an unusual and unexpected way." (Emphasis added.)

There are a large number of other cases by the Texas Courts as well as a host from other jurisdictions in which the expression "accidental means" was considered. Several of the Texas cases were as follows:

International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.2d 282, in which infection followed the pulling of a wisdom tooth. It was found that the infection entered the body after the tooth was pulled rather than having been present already. In Home Benevolent Ass'n v. Smith, Tex.Civ.App., 16 S.W.2d 357, (review denied by the Supreme Court of Texas) a ruptured artery resulted from the cranking of a Ford automobile, from which the insured died within ten minutes. The verdict and judgment for the plaintiff were affirmed, the Texas Court of Appeals citing the Barry case. International Travelers' Ass'n v. Dixon, Tex.Civ.App., 283 S.W. 681, involved pulling weeds out of a garden, insured fell backwards on his head

and right side, became paralyzed. One doctor swore that the *fall* caused a rupture of a blood vessel in the brain; another said *the rupture caused the fall.* The verdict was for the insured and was affirmed. In Hanna v. Rio Grande National Life Insurance Co., Tex.Civ.App., 181 S.W.2d 908, deceased had taken one dose of a sulfa drug, doctor gave him another, not knowing of the first. This was held to be a mistake and was due also to unknown reaction of the drug. The lower court was reversed, the court citing the Barry and Bryant cases, supra, one judge dissented and expressed the belief death occurred from some abnormality in the body rather than from voluntary act of taking sulfa. Bankers' Health & Accident Co. v. Shadden, Tex. Civ.App., 15 S.W.2d 704, was another instance of cranking automobile, the heart was overly dilated and death ensued; it was held something unforeseen, unexpected and unusual occurred, notwithstanding voluntary act of cranking the car, and was due to accidental means. In Standard Accident Insurance Co. v. Cherry, Tex.Civ.App., 48 S.W.2d 755 deceased had carried 200-lb. block of ice on his back as usual, threw it in high box in manner generally used, tore muscles, etc., in back, causing permanent disability, which it was held was caused by accidental means, one judge dissenting. Pacific Mutual Life Insurance Co. v. Schlakzug, 143 Tex. 264, 183 S.W.2d 709, 710 involved two provisions (1) accidental means and (2) exclusion of " 'bacterial infection (except Pyogenic infection)' ", which occurred simultaneously with accidental cut or wound; insured plucked hair from his nose and died from Pyogenic infection; court held if only first provision had been involved, death would have been caused by "accidental means", citing Francis, supra, but that under second provision, wound in nose would be accidental only if insured did not know plucking of hair would leave hole or wound through which infection could enter; case was reversed because of improper ruling as to admissibility of evidence.

In a more recent case (1934) Landress v. Phoenix Mutual Life Insurance Co., 291 U.S. 491, 54 S.Ct. 461, 462, 78 L.Ed. 934, the Supreme Court reviewed the rulings of the District and Appellate courts which had sustained a demurrer to the complaint where death was due to sunstroke while the deceased was playing golf. There were two policies, the provisions of which were (1) death resulting " 'directly and independently of all other causes from bodily injuries effected through external, violent and accidental means, and not directly or indirectly, wholly or partly from disease or physical or mental infirmity' "; and (2) for death " 'from bodily injuries effected directly and independently of all other causes through external, violent and accidental means' ".

In disposing of the matter, the court, through Justice Stone, said:

"Petitioner argues that the death, resulting from voluntary exposure to the sun's rays under normal conditions, was accidental in the common or popular sense of the term, and should therefore be held to be within the liability clauses of the policies. But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident,' see Lewis v. Ocean Accident & Guarantee Corp., 224 N.Y. 18, 21, 120 N.E. 56, 57, 7 A.L.R. 1129; see, also, Aetna Life Ins. Co. v. Portland Gas & Coke Co., 9 Cir., 229 F. 552, L.R.A.1916D, 1027, for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. *The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated*

*to be the rays of the sun, to which the insured voluntarily exposed himself. Petitioner's pleadings do not suggest that there was anything in the sun's rays, the weather, or other circumstances external to the insured's own body and operating to produce the unanticipated injury, which was unknown or unforeseen by the insured.*

"We do not intimate that injuries resulting from as impalpable a cause as the inadvertent introduction into the body of noxious germs may not be deemed to be effected by external accidental means. See Western Commercial Travelers' Ass'n v. Smith, 8 Cir., 85 F. 401, 40 L.R.A. 653; Jensma v. Sun Life Assur. Co., 9 Cir., 64 F.2d 457. *Nor do we say that in other circumstances an unforeseen and hence accidental result may not give rise to the inference that the external means was also accidental.* Compare Jensma v. Sun Life Assur. Co., supra; Gustafson v. New York Life Ins. Co., D.C., 55 F.2d 235. *But, in the light of such knowledge as we have, no such inference can arise from the bare allegation of death by sunstroke,* compare Pope v. Prudential Ins. Co., 6 Cir., 29 F.2d 185; Ryan v. Continental Casualty Co., 5 Cir., 47 F.2d 472, *with no indication that some unforeseen or unintended condition or combination of circumstances, external to the state of the victim's body, contributed to the accidental result.* The petitioner has thus failed to plead facts establishing the liability defined by the policy." (Emphasis added.)

Appellant here presents several alleged errors below, including improper argument to the jury by plaintiff's counsel, and the failure of the court to properly charge the differences between "accidental death" and "death by accidental means". However, since we find the exception to the charge requires us to reverse the case, it is not necessary to consider the matter of argument as we assume it will not be repeated. The only reference in the charge to accidental means is found in the record beginning at page 154. After stating the question was whether deceased came to his death by accidental means, the court read to the jury charges requested by each side, that for the plaintiff being as follows:

"I will read you in part a charge requested by plaintiff.

"If the deceased sustained an injury as claimed, and that such injury (sic) affected solely and independently of all other causes through accidental means the death of the insured, then the plaintiff is entitled to recover.

"The term accidental is here used in its ordinary and popular sense, and in that sense it means happened by chance, unexpectedly taking place, not in accordance with the usual course of things, not as expected.

"An accidental death may be caused by the crushing of the body and the bones. It may be caused by smothering it. It may be caused by poison, accidentally administered. It may be caused by some organ of the body being caused to collapse by accidental injury, as the rupture of a blood vessel or the suppression of the breathing apparatus."

The charge given at the request of the defendant immediately following, was:

"The term 'caused directly and exclusively by bodily injury sustained solely and independently of all other causes through accidental means, means that for the death of the deceased, Mr. F. A. Douglass to be covered by the defendant's accident policy, his death must be caused directly and exclusively by bodily injury, which injury resulted solely from an accident independent of any natural causes, as applied here to find for the plaintiff you must find from a preponderance of the evidence that whatever caused the

death of the deceased that it resulted directly from an injury which was caused solely by an accident without any preexisting disease or condition.' "

The charge was rather short, consisting altogether of some four printed pages in the record and after it was completed, counsel for the defendant stated:

"The defendant excepts to that portion of the charge or instruction that where as the Court states accidental injury, or accidental means, I forget exactly the language of the Court, means a crushing of the bones, and another illustration, that it means a rupture of a vessel, for the reason that the same invades the province of the jury, and is a comment which would be calculated to cause the jury to believe that the Court is of the opinion that the rupture of the intima of the aorta, in this instance, was the result of accidental means, or was caused by accidental means.

*"The defendant further excepts to the Court's charge because the same fails to define and instruct the jury on the meaning of accidental means.*

"In this connection, defendant tenders the definition heretofore submitted to the Court, as follows:

"Accidental means is something that was unforeseen, unusual, unexpected, and involuntary, *in the means of performing the act in question*, but not in the result of performing the act, and in this instance, accidental means does not mean the result of death which in this instance occurred. (Emphasis added.)

"That is all.

"The Court:

"Court Reporter, turn to that part of the charge wherein I refer to the fact that an accident might result from various causes.

"(Said portion of charge above referred to was read, as follows):

" 'An accidental death may be caused by the crushing of the body and the bones. It may be caused by smothering. It may be caused by poison, accidentally administered. It may be caused by some organ of the body being caused to collapse by accidental injury, as the rupture of a blood vessel or the suppression of the breathing apparatus.'

"The Court:

"I will let the charge stand. I will give you a bill."

In the case of Landress v. Phoenix Mutual Life Ins. Co., supra, the Supreme Court made the difference between accidental death and death by accidental means quite clear, as appears in the rather long quotation above, but the real meat of the matter it is believed is found in the following:

"But it is not enough, to establish liability under these clauses, that the death or injury was accidental in the understanding of the average man—that the result of the exposure 'was something unforeseen, unexpected, extraordinary, an unlooked-for mishap, and so an accident,' * * * for here the carefully chosen words defining liability distinguish between the result and the external means which produces it. The insurance is not against an accidental result. The stipulated payments are to be made only if the bodily injury, though unforeseen, is effected by means which are external and accidental. The external means is stated to be the rays of the sun, to which the insured voluntarily exposed himself. *Petitioner's pleadings do not suggest that there was anything in the sun's rays, the weather, or other circumstances external to the insured's own body and operating to produce the unanticipated injury which was unknown or unforeseen by the insured.*" (Emphasis added.)

The lower court we think should have instructed the jury, at least in sub-

stance, as requested by counsel for the defendant, thereby making it clear that if they found the bursting of the blood vessel caused the death as to which there seems no dispute, then the *important question was, did anything unusual, unforeseen, unexpected, or out of the ordinary happen in the act of lifting the crate from the station wagon,* other than the picking it up and setting it on the floor, and *but for which he would not have been injured.*

We are therefore constrained to hold that because of the failure to properly instruct the jury as to the difference between accidental death and death by accidental means, the verdict and judgment should be set aside. We are further of the view that as the record now stands it does not support a conclusion that death was caused by accidental means. It is therefore remanded to permit the lower court to grant a new trial, if plaintiff is able to produce further evidence to sustain liability; otherwise it should render judgment for defendant notwithstanding the verdict.

(Judge Strum participated in the hearing and decision of this cause, but died before the opinion was filed.)