PAN AMERICAN LIFE INSURANCE COMPANY et al., Appellants,

v.

Mrs. Elizabeth Cotton ANDREWS, Guardian, et vir, Appellees.

No. 7090.

Court of Civil Appeals of Texas.

Texarkana.

March 10, 1959.

Rehearing Denied April 14, 1959.

Vinson, Elkins, Weems & Searls, B. Jeff Crane, Jr., Houston, for appellants.

Kennedy & Granberry, Crockett, for appellees.

DAVIS, Justice.

Plaintiff-appellee Mrs. Elizabeth Cotton Andrews, Guardian of the Person and Estate of Sharon Elizabeth Simmons, a Minor, sued defendants-appellants, Pan American Life Insurance Company and Continental

Assurance Company under the double indemnity provisions of two life insurance policies issued upon the life of Harrington Griffin Simmons, deceased, being the same person as Harrington G. Simmons. The cases were filed separately but by agreement were consolidated and tried together.

Mr. Simmons was an accountant and rented an upstairs office in the city of Crockett, and on December 4, 1953, a fire occurred in the building occupied by Simmons. It was alleged that as a result of the fire Simmons suffered a psychic trauma as the result of fright and exertion that caused cerebral arterial thrombosis which resulted in his death on January 7, 1954. The principal sum of the insurance in each policy was paid by the companies without waiver on the part of any of the parties as to the double indemnity provisions. The trial court rendered judgment for plaintiff-appellee and defendants-appellants have appealed.

The provision of the Pan American Life Ins. Co., policy involved in this suit reads as follows:

"Upon receipt of due proof that the death of the insured occurred in consequence of bodily injuries effected solely through external, violent and accidental means, of which (except in the case of drowning or of internal injuries revealed by an autopsy) there is a visible contusion or wound on the body, and that such death occurred within sixty days after such injury was sustained, and as a direct result thereof, independently of any other cause, * * * the Company will, upon surrender of the policy, in lieu of all other benefits under this policy, pay to the beneficiary or beneficiaries under this policy, subject to the change of beneficiary clause, double the face amount of this policy."

The provision in the Continental Assurance Company policy involved in this suit reads as follows:

"Upon receipt at its home office in Chicago, Illinois, of due proof that the death of the insured has resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidental means and that said death occurred while said policy and this supplementary contract are in full force and within ninety (90) days from the accident causing such injuries, it will pay to the beneficiary designated in said policy a sum equal to the face amount of the policy, in addition to the amount otherwise payable under the said policy.

"This supplementary contract does not cover death resulting from:

"(a) Bodily injuries of which there is no visible contusion or wound on the exterior of the body, except in case of drowning or internal injuries revealed by an autopsy; * * *"

Appellants bring forward one point of error which reads as follows:

"The court erred in rendering judgment for Appellees because there is no evidence that Harrington G. Simmons died in consequence of bodily injury effected solely through external, violent and accidental means or of internal injuries revealed by autopsy or as a direct result thereof, independently of any other cause."

The only question for this Court to decide is: Does the record in this case reveal sufficient evidence of probative force to support the implied finding on the trial court that Harrington G. Simmons died as the result of accidental internal injuries revealed by an autopsy? No findings of fact were filed by the trial court and none were requested. If there is any evidence of probative force to support the implied finding of the trial court, the judgment of the trial court must be affirmed. City of Abilene v. Meek, Tex.Civ.App., 311 S.W.2d 654, n. w. h.; Rule 299, Vernon's Ann.Texas Rules of

Civil Procedure, and authorities cited thereunder.

Appellants do not contend that the fire was not an accident. Much has been written about "accident" and "accidental means" in such cases, and a late and thorough discussion of their meanings will be found in the case of Schonberg v. New York Life Ins. Co., 235 La. 461, 104 So.2d 171, 172. This case also discusses the ingenious theories that have been advanced on the courts for many generations. A study of this opinion and the authorities therein cited is enlightening. In the Schonberg case the deceased died from " 'anaphylactic shock' produced by a very rare blood transfusion reaction," which was revealed by an autopsy.

It is undisputed that fright and exertion produce mental reactions such as psychic trauma, traumatic neurosis, and traumatic aneurasthenia that produce internal injuries. Pacific Mutual Life Ins. Co. of California v. Tetinick, 185 Okl. 37, 89 P.2d 774; Gulf, C. & S. F. R. Co. v. Hayter, 93 Tex. 239, 54 S.W. 944, 47 L.R.A. 325; Shepherd's S. W. Reporter citations reveals that the Hayter case has been cited more than 50 times; many times in other jurisdictions. A late case cited being Sutton Motor Co. v. Crysel, Tex.Civ.App., 289 S. W.2d 631, n. w. h.

During the fire, several witnesses testified that they noticed Simmons was nervous and excited during the fire and after the fire they noticed a slight limp in his walk; they saw him carry heavy baskets of papers from the office across to an adjoining building and lifting them over a fire wall; they heard him almost immediately complain of backache and headache; and after the fire, he displayed a nervous condition that had never been noticed prior to the fire. He commenced complaining of numbness in his right side on the day of the fire. His condition gradually became worse until he had to be hospitalized. Brain surgery was done at Methodist Hospital in Houston, and he died January 7, 1954. After his death an autopsy was performed from which it was revealed that Mr. Simmons had suffered a cerebral arterio thrombosis probably caused by psychic trauma, the definition of which is as follows: "Trauma, a wound or injury; psychic trauma, an emotional shock · that makes a lasting impression on the mind, especially the subconscious mind." The definition is taken from the 13th edition of Gorman's Medical Dictionary.

There is a conflict of medical testimony as to the cause of the death. Two death certificates were filed. The first one, signed on the date of death, showed the cause of death to be brain tumor. After the autopsy, a corrected death certificate was filed showing the cause of death to be: "(a) cerebral thrombosis, bilateral posterior cerebral arteries;" due to "(b) exertion because of fire in office before December 4, 1953." This later death certificate showed: "18b. Major finding of operation: high infra-cranial pressure; necrotic brain;" and further, "20f. How did injury occur? Trying to save records from burning building." This amended death certificate was offered in evidence by appellants without any limitation whatever and therefore they are bound by its contents. Attached to this amended death certificate was an affidavit which reads as follows:

"The State of Texas
"County of Harris
    "Before me on this day appeared Dr. James A. Greenwood, Jr., known to me to be the person whose name is signed to the above certificate, who on oath deposes and says that the facts stated in the foregoing certificate are true and correct to the best of his knowledge and belief, and that this certificate is filed for the purpose of correcting the original record of the death of Harrington G. Simmons.
    "/s/ James A. Greenwood, Jr., M.D.
    "Sworn to and subscribed before me this 18th day of February, 1954.
    "/s/ Ocie Rae McDonald
    "Notary Public in and for Harris
"(L.S.)                County, Texas."

The medical experts were mostly agreed that the cause of death was cerebral arterial thrombosis.

Dr. Greenwood, who performed the operation and recommended the autopsy, testified as follows:

"Q. Doctor, from your examination of Mr. Simmons, from the history he gave you at the time you first saw him, from the tests you made on the 4th day of January, from the surgical processes you performed on the 4th of January, and from the autopsy on the 7th day of January, were you able to determine the cause of death of Mr. Simmons in your medical opinion? A. Yes, sir.

"Q. What was that? A. Cerebral thrombosis.

"Q. Doctor, were you able from those surgical tests and autopsy and history, able to determine absolutely the cause of that thrombosis? A. That is a hard question to answer. There was a congenital tendency because of a small posterior cerebral artery. Arteriosclerosis was only moderate and there was very little in those arteries surprisingly. I think it is very difficult to say why a thrombosis occurs at a particular time, or in one particular vessel, it is very much more common in vessels that are badly diseased, they do occur in vessels that have little or no arteriosclerosis.

"Q. What are, in your medical opinion, the possible causes of Mr. Simmons' thrombosis, possible causes? A. Well, there are things we consider as possible causes. Just the medical causes?

"Q. Based upon the history, your examinations, your surgery, and the autopsy, what would be the possible causes of Mr. Simmons' thrombosis? A. I think you would have to divide it into two large groups, it could be where there was no specific cause, where it is congenital, or it could be

where you have a severe exertion like at the time of the fire or severe emotional stress and strain might have been instrumental in precipitating the actual thrombosis.

"Q. In your opinion, was there sufficient arterio-sclerosis to have caused the thrombosis in Mr. Simmons' case? A. I will say ordinarily not, no, sir.

"Q. Doctor, do you know what caused Mr. Simmons' thrombosis? A. No, sir.

"Q. Do you have an opinion based upon your tests, examinations, history, surgery and autopsy, as to what possibly caused the thrombosis? A. I don't think I can answer that definitely any more or any further than I already have. If it can be shown he did undergo severe exertion or extreme emotional strain or received an actual blow or injury, then those things would certainly be considered as factors in the possible precipitation of his thrombosis; other than that, we can just say it happened."

Then, in response to a hypothetical question outlining the foregoing question, he testified as follows:

"Q. * * * would those facts allow you to determine with any more probability or certainty as to the cause of Mr. Simmons' thrombosis? A. I think you can certainly say this, it is difficult to begin on or about that time, at the time of the fire or immediately afterwards, I mean within the subsequent hours of a day or two afterwards, and you would certainly have to admit the possibility of the unusual exertion which he had as being a precipitating factor. I do not know that I want to go any further than that.

"Q. Doctor, in your medical opinion, is it possible for a high degree of emotional stress to be the cause of cerebral artery thrombosis? A. Yes, sir.

"Q. In your medical opinion, is it possible for severe over-exertion to be the cause of cerebral artery thrombosis? A. Yes, sir.

"Mr. Crane: We will offer the cross-examination, if the Court please.

"Q. As I understand it, it is your opinion that if Mr. Simmons suffered the high degree of over-exertion and great emotional stress about the time of that fire, those may have been factors contributing to bring about this condition you found in Mr. Simmons when you examined him and operated on him? A. Yes, sir.

"Q. When you examined Mr. Simmons did you find any indication of any blows to the head? A. Well, you see, I saw him 26 days later.

"Q. Did you find any indication of any blow or any trauma to any other part of his body? A. No, sir.

"Mr. Crane: That's all of the cross-examination.

"Mr. Kennedy: We read the Redirect.

"Q. In your medical opinion, is it possible that this thrombosis could have been caused by a blow to the head? A. In his case?

"Q. Yes, sir. A. I seriously doubt that, no history of a blow and no history of unconsciousness. The fact of over-exertion and severe emotional stress would probably be much more important.

"Q. Doctor, in answering the question by Mr. Crane, you spoke of trauma, in your work and studies you usually or do you usually mean by trauma, physical trauma? A. Yes, sir.

"Q. Do you and the medical profession recognize emotional trauma? A. Yes, sir.

"Q. Do you and the medical profession recognize mental trauma? A.

That would be in the same group. Yes, sir."

In giving a history of his illness to Dr. Abe Hauser, a physician who limited his practice to psychiatry and neurology, witness for appellants who examined Mr. Simmons, testified that Mr. Simmons told him about the fire in his office and of trying to save his records and while doing this, he, Simmons, noticed the numbness and stiffness in his right leg and shoulder for the first time.

In response to questions propounded to a Dr. Dean, he testified as follows:

"Q. Doctor, the testimony by deposition of Dr. Greenwood, Dr. Hauser and Dr. Newton show that the cause of death of Mr. Simmons was a cerebral arterio thrombosis. Now, Doctor, from your examination of Mr. Simmons and your history he gave you, your knowledge of him, what, in your opinion, if you have had an opinion, caused that cerebral arterio thrombosis? A. That question has to be elaborated on and I would have to ask whether you mean speaking from a pathological standpoint, the actual processes involved or whether you mean the cause of the processes.

"Q. I mean, what, in your opinion, was the cause of the processes? A. Well, in my opinion, the thing that set off the chain of reaction that produced this condition, was probably psychic trauma."

In response to a question by counsel for appellant, Dr. Dean testified that:

"A. The fire produced the reaction in his mind, which is capable of producing damage to the cells tissue, not only in the brain, but other organs too. It's a nervous phenomena. You have to remember that the brain is the center of all nerve impulses in the body, and what goes out from that controls all the body mechanism."

Dr. Edward Dorsey testified as follows:

"Q. In your professional opinion, could psychic trauma cause the cerebral artery thrombosis, which the evidence shows, caused Mr. Simmons' death? A. In my opinion there is a connection between some of the cerebral vascular action that we see and emotional upset. Just as a connection between cardiac as we would see in the heart and emotional upset.

"Q. Doctor, in view of what I have just told you about the evidence showing the cause of Harry's death, and the statement I have made to you, besides what you know yourself about that fire and his office being in that fire, state whether or not, in your opinion, that fire was or produced the psychic trauma that caused Mr. Simmons' cerebral artery thrombosis? A. I certainly think it was possible. I don't know all of the —I didn't do the autopsy examination and exactly what changes, I haven't read the autopsy report or anything like that. In my opinion I certainly think it was enough psychic trauma to have had that effect."

And later, he testified in response to questions by the Court:

"Q. Doctor, I want to ask you some questions. A. Yes, sir.

"Q. Do you feel like that the fire and what happened to Mr. Simmons there, in reasonable probability caused the psychic trauma that set in motion the disease that caused his death? A. Of course, as I have stated, the possibility and probability, the two words of possibility and probability—

"Q. I want to know about the reasonable probability. A. I think there is a reasonable probability. I'll answer it that way."

Injury by fright is recognized by our Workmen's Compensation Law, Vernon's Ann.Civ.St. art. 8306 et seq., and a recent case holding that the evidence was sufficient to show injury by fright is Aetna Ins. Co. v. Hart, Tex.Civ.App., 315 S.W.2d 169, wr. ref., n. r. e.

 There is no question but that the fire was external, violent and accidental. We think the evidence is sufficient to support the trial court's implied finding that it produced the psychic trauma that caused the cerebral arterial thrombosis, and internal injury which was revealed by the autopsy. The point is overruled.

The judgment of the trial court is affirmed.