PAN AMERICAN LIFE INSURANCE COMPANY ET AL v.
MRS. ELIZABETH COTTON ANDREWS ET VIR.

No. A-7335. Decided November 23, 1960.
Rehearing Overruled December 31, 1960.
(340 S.W. 2d Series 787)

*Vinson, Elkins, Weems & Searls* and *B. Jeff Crane,* all of Houston, for Petitioners.

The Court of Civil Appeals erred in affirming the judgment against petitioners because there is no evidence that the insured died as the consequence of bodily injury effected solely through external, violent and accidental means producing a visible con-

tusion or wound on the exterior of the body. Bryant v. Continental Casualty Co., 107 Texas 582, 182 S.W. 673; Radcliffe v. National Life & Acc. Ins. Co., 298 S.W. 2d 213, error refused N.R.E.; Robinson v. Aetna Life Ins. Co., Texas Com. App., 276 S.W. 900.

*Kennedy & Granberry* and *C. W. Kennedy, Jr.,* of Crockett, for respondents.

In response to petitioners' point of error cite, Quinn v. Dupree, 157 Texas 441, 303 S.W. 2d 769; American Motorists Ins. Co. v. Landes, 252 Fed. 2d 715; North British & Mercantile Ins. Co. v. Arnold, 171 S.W. 2d 215, writ refused.

MR. JUSTICE CULVER delivered the opinion of the Court.

The petitioners' motion for rehearing is granted. Our opinion handed down in this case on October 5, 1960, is hereby withdrawn and the following substituted therefor.

Mrs. Elizabeth Cotton Andrews as guardian of a minor beneficiary, sued Pan American Life Insurance Company and Continental Assurance Company to recover double indemnity or accidental death benefits as provided in the policies issued by the respective companies on the life of Harrington G. Simmons. The suits having been consolidated, trial was before the Court without the aid of a jury and judgment was rendered for plaintiff. The Court of Civil Appeals has affirmed. 323 S.W. 2d 287.

The double indemnity provision of the Pan American policy reads:

"On receipt of due proof that the death of the Insured occurred in consequence of bodily injuries effected solely through external, violent and accidental means, of which (except in the case of drowning or of internal injuries revealed by an autopsy) there is a visible contusion or wound on the body, and that such death occurred within sixty days after such injury was sustained, and as a direct result thereof, independently of any other cause, * * * the Company will, upon surrender of the policy, in lieu of all other benefits under this policy, pay to the beneficiary or beneficiaries under this policy, subject to the change of beneficiary clause, DOUBLE THE FACE AMOUNT OF THE POLICY."

The Continental provision is substantially to the same effect as follows:

"Upon receipt at its Home Office in Chicago, Illinois, of due proof that the death of the Insured has resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidental means and that said death occurred while said policy and this supplementary contract are in full force and within ninety (90) days and from the date of the accident causing such injuries, it will pay to the beneficiary designated in said policy a sum equal to the face amount of the policy, in addition to the amount otherwise payable under said policy.

"This supplementary contract does not cover death resulting from:

"(a) Bodily injuries of which there is no visible contusion or wound on the exterior of the body, except in case of drowning or internal injuries revealed by autopsy; * * * ."

We conclude that there is no evidence that the insured died in consequence of bodily injuries effected solely through external, violent and accidental means. The judgments of the trial and the Court of Civil Appeals must be reversed and here rendered in favor of petitioners.

Early in the morning of December 4, 1953, a fire occurred in the building where the insured had his office. He was observed watching the fire and seemed to be nervous and upset. On the following day after the fire, it was noticed that he walked with a limp. On the same day insured called on his family physician, Dr. Dean, who treated him for a low-grade sinus condition. He told the doctor with considerable emotion that the fire was very serious so far as he was concerned, that it had him "in a jam" because his records were practically destroyed and it was near the end of the year. Mrs. Andrews, the respondent, testified that she saw the insured on the afternoon of the day of the fire at her home. She observed that he was favoring his right foot. On inquiry he told her that he thought he must have been hurt at the fire. He had a headache and was rubbing his head and she gave him an aspirin. She had never noticed him rubbing his head before and for that reason made inquiry.

On Saturday morning following the fire he appeared to be still very nervous and upset and borrowed field glasses in an effort to see into his office. On the following Sunday insured made several trips into his office, entering from the top from an adjoining building and was observed carrying out wire baskets

that contained his papers and files. On Monday following while someone was helping him move a desk into another office he dropped the end he was carrying and complained that his arm and leg had been giving him some trouble during the last day or two. Thereafter he developed some loss of sensation in his extremities and his condition progressively deteriorated. A neurologist examined him on December 22nd and hospitalized him on the 25th. On January 4th a neurosurgeon performed a brain operation and insured died January 7th, some 34 days after the fire.

The Court of Civil Appeals' opinion quotes much of the medical testimony in question and answer form. Dr. Dean was of the opinion that "the thing that set off the chain of reaction that produced this condition was probably 'psychic trauma,' " and that "the fire produced the reaction in his mind, which is capable of producing damage to the cells tissue not only in the brain, but other organs." Dr. Dorsey was of the opinion that there was a reasonable probability that the psychic trauma suffered by the insured as a result of the fire was the cause of the thrombosis.

The insured was not in the building at the time of the fire. He viewed it from a safe distance. He was in no personal danger and suffered no fright. Regarding the evidence most favorable to the respondent, it must be conceded that the fire or the act of viewing the fire was but a remote cause of the insured's death. The psychic trauma was brought about by the anticipation on the part of the insured that records of personal property located in the building were being damaged or destroyed and by the natural concern over the loss of the contents of his office.

These policies by their terms expressly exclude from coverage those bodily injuries where the external and violent means fail to exert sufficient force upon the body so as to produce outwardly visible evidence thereof except where that force has otherwise left its mark within the body and that revealed by an autopsy. If it be said that the sight of the fire produced a nervous tension in the mind of the insured and that tension in turn resulted in psychic trauma that condition was not revealed by an autopsy. The autopsy only showed the presence of a thrombosis which the doctor testified was probably cause by the psychic trauma.

We are not here concerned with the distinction made in some decisions between accidental means and the accidental death, as discussed in United States Mutual Accident Ass'n. v. Barry,

131 U. S. 100, 9 Sup. Ct. 755, 33 L. Ed. 60. In that case Barry was allowed recovery for injuries received while jumping from a platform. Although the jumping was intentional on Barry's part the injury was accidental within the meaning of the policy.

Respondent cites three cases, Hill v. Kimball, 76 Texas 210, 13 S.W. 59; 7 L.R.A. 618; Gulf, Colorado & Santa Fe Ry Co. v. Hayter, 93 Texas 239, 54 S.W. 944; 47 L.R.A. 325; Houston Electric Co. v. Dorsett, 145 Texas 95, 194 S.W. 2d 546, for the proposition that where physical injury results from fright or other mental shock caused by the wrongful act of another, the injured party is entitled to recover his damages and seeks to apply that doctrine to the facts of this case. We do not at all disagree with that rule. We do not agree, however, that this rule applicable in tort law is to be followed in determining the rights of parties under contractual provisions. We have found no case nor have we been cited to one that allows the terms of these policies to be construed as contended for by respondent.

Neither the fire nor the view of the fire can be said to be "accidental, external and violent," so far as insured is concerned any more than if he had read an account of the fire in the newspaper a week later or if he had been told of the fire and the destruction of his records during his absence from the city. Surely, under a reasonable interpretation of the contract it could not be said in those events that the insured had suffered bodily injuries as a result of external, violent and accidental means.

■ In a recent decision, United American Ins. Co. v. Selby, 161 Texas 162, 338 S.W. 2d 160, in enforcing a contract of insurance according to its terms we pointed out that "contracts of insurance are to be construed as other contracts and * * * all parts of the contract are to be taken together."

"We recognize the general rule that contracts of insurance are to be strictly construed in favor of the insured, but this does not affect the further general rule that contracts of insurance are to be construed as other contracts, and that all parts of the contract are to be taken together, and such meaning shall be given to them as will carry out and effectuate to the fullest extent the intention of the parties."

■ The erm "external and violent means" connotes some physical force or impact applied to the body of the insured even though it be slight.

"The term 'violent,' in such provision, signifies merely that a physical force, however slight, is efficient in producing the injury." 45 C.J.S., Insurance, section 754, p. 784.

At the beginning of this section the statement is made:

"A provision of the policy, covering death or bodily injury which results solely by or through 'external, violent, and accidental means,' applies only where the elements of force and accident concur in effecting the injury, unless the clause is in the disjunctive, as "external, violent, or accidental" means, in which case injury from external and violent means alone is sufficient. If, however, the cause of the injury or death can be shown to be due to accidental or unnatural means, this imports that such injury or death is due to external and violent means, and the nature and character of the injury may also be sufficient to establish that it was inflicted by external and violent means."

■ We will review briefly some of the cases said to bear upon the problem before us, none of which support respondent's theory of recovery.

In McGlinchey v. Fidelity and Casualty Co., 80 Me. 251, 14 Atl. 13, 6 Am. St. Rep. 190, there is dictum to the effect that fright alone sufficient to produce death is to be considered as violent and accidental means. In that case the death was said to have been caused by overexertion and fright in trying to control runaway horses. Clearly in that case there was physical force exerted upon the deceased, but even if the dictum be accepted as correct in that case the terms of the policy are not disclosed that decision cannot even be persuasive here. Balanced off against that expression is the contrary dictum in Provident Life & Accident Ins. Co. v. Campbell, 18 Tenn. App. 452, 79 S.W. 2d 292, namely that mental shock or disturbance is not a bodily injury within the contemplation of the insurance contract (a contract similar to the one before us). In so holding the Tennessee Court discussed and disagreed with the dictum in McGlinchey.

In Pierce v. Pacific Mut. Life Ins. Co., 7 Wash. 2d 151, 109 Pac. 2d 322, by a divided court, recovery under an accident policy was allowed where the insured became frightened, thinking that a collision between his car and another was inevitable, as a result of which it was found that he suffered a cerebral hemorrhage or stroke. The Court held in that case that fright or mental shock unaccompanied by physical impact is sufficient to

constitute "accidental means" within the purport of that term as used in the policies. It does not appear that the policies in question contained the provision, "external, violent and accidental means." The provision as quoted in the opinion is as follows: "Against bodily injuries sustained * * * solely through accidental means * * * and resulting directly, independently and exclusively of all other causes * * * ." The decision cites in support of its holding only two tort cases from that jurisdiction that allow recovery for injuries resulting solely from fright. Because recovery for fright is allowed in tort cases and in suits brought under workmen's compensation law, that fact does not control or assist materially in the construction of a contract of insurance. Certainly the plaintiff in that case could not have recovered if the policy had excluded "bodily injuries of which there is no visible contusion or wound on the exterior of the body and no internal injuries revealed by autopsy." In every case we have found except Pierce, supra, there has been exerted on the insured some physical force such as inhalation of gas, drowning, infection from needle, sunstroke, exposure of rays or heat lamp, periostitis, sleeping on the hand, sting of an insect falling and slipping cases, and the like.

In Hanna v. Rio Grande National Life Ins. Co., Texas Civ. App., 181 S.W. 2d 908, wr. ref, death was caused by an overdose of sulfanilamide which of course operated with physical force and impact upon the body of the deceased. We fully concur in that decision in allowing recovery of the policy. The quotation from Vance on Insurance cited therein was taken from a discussion of the proposition that, while in instances of death from poison, asphyxiation and drowning, the agent operates internally, the result is from external means. These agents, of course, do not leave any visible contusions or other outward marks, but do bring to bear physical force upon the body and may be revealed by autopsy. Vance is further quoted in the Hanna opinion as follows: "Likewise, the term 'violent' as applied to cause of accidental injury, means merely that the cause is sufficient in producing a harmful result. It is not necessary that it shall be violent in the sense of breaking tissues or otherwise physically and visibly affecting the body." Vance on Insurance, 2d Ed., section 258, p. 880. Cited as authority for that statement is Paul v. Traveler's Insurance Co., 112 N.Y. 472, 20 N.E. 347, where recovery was allowed for death of the insured caused by inhalation of illuminating gas. Clearly Professor Vance is not implying here that recovery can be had for a purely mental reaction without application of some physical force. Immediately following his quoted statement he elucidates:

"* * * Thus where the insured was injured by his straining efforts to stop his horse that was running away, it was held that the cause of the injury was both external and violent, although the result was entirely internal, being probably a rupture of a blood vessel near the heart. And so it has been held that where an injury is received in attempting to lift a heavy weight, or from any other kind of overexertion, the result may be attributed to an external and violent accidental cause."

In American Accident Co. v. Reigart, 94 Ky. 547, 23 S.W. 191, where the insured's death was caused by eating a piece of beefsteak that accidentally passed into his windpipe choking him to death in a few moments, the company made the contention that the death was not caused by an external force. The court in allowing recovery reasoned that death was caused by violent and accidental means, even though the force was applied internally, saying that it was as much an accident as if the insured had taken poison under some misapprehension that it was harmless and that unquestionably recovery would have been allowed in that circumstance. There was no contention that no physical force was exerted.

The case of International Travelers' Ass'n. v. Brannum, 169 S.W. 389, sheds little light on the problem. In that case the provisions of the policy were not set forth in either opinion other than to say that in case of accidental death there should be payable the sum of $5,000.00. The testimony was to the effect that the insured accidentally fell, his body striking the floor burned to death and, in coming from the bathroom, the insured had fallen and remembered nothing until he came to himself some time later. The plaintiff pleaded that the shock and excitement caused the rupture of the blood vessel and also pleaded that the insured accidentally fell, his body striking the floor with great force causing the rupture and death. Some days later the plaintiff further pleaded that death was the direct result of both the excitement and the fall. The Court of Civil Appeals held that the apoplexy was caused by accidental means. The Supreme Court reversed and rendered, holding that all of the testimony as to any accident was hearsay and inadmissible.[1]

The injury here was wholly and solely caused by a mental reaction and no different in all probability to what the deceased would have suffered if someone had told him about the fire on the following morning. He would still have been disturbed only and solely because of the property loss.

---

1.—212 S.W. 630.

Seemingly the intention of the parties as disclosed by the double indemnity contract was that before recovery could be had it must be determined with some degree of certainty that death resulted from an accidental injury, but here we have speculation on speculation. It is speculated that the deceased suffered a psychic trauma and then it is speculated that the psychic trauma produced a thrombosis.

■ The provision for autopsy is to afford the opportunity for establishing the fact that death was caused by a physical force where there was no outward manifestation on the body of that force. Otherwise no recovery could be had for an accidental death caused by taking into the body poisonous substances or for other injuries sometimes caused to internal organs of the body or by external physical force without any visible contusion or wound. The provision for autopsy was not to set up a new category of injuries such as mental shock, but simply as a means of determining that death did result from some physical and violent force. The fact that in all the years similar limiting language has been in general use in accident policies without any authoritative application to an injury caused by purely mental processes, militates against the adoption of a contrary interpretation here.

We can see no distinction between the case at bar and a fatal attack of heart failure suffered by an insured induced by the excitement of watching a football game or a television program or in fact worry brought about by financial or domestic problems if that mental disturbance is said to have caused a thrombosis which in turn caused the death.

In respondent's supplemental brief she says that she does not agree with petitioners that "accidental means" involving mental reaction is the only presumed finding of the trial court which petitioners had the burden of overcoming. Presumably she refers to the physical exertion expended by the insured in carrying the baskets of papers and records out of his office and the occasion when he dropped one end of the desk that he was carrying. The deceased did make some statements to Dr. Dean to the effect that on the 16th "he said he thought he had injured himself during the fire or right after the fire. He was crawling around on the building to see about his equipment and records." There was no evidence that what he did was strenuous. The testimony introduced by respondent shows that whatever caused his condition had its inception on the day of and the day following the fire and before there was any exertion. In the

second place, while there is medical testimony by Dr. Dean that thrombosis might be congenital or it could be caused by severe exertion, or severe emotional stress and strain might have been instrumental in preipitating the thrombosis, he nowhere testifies that in his opinion exertion probably resulted in thrombosis. Dr. Dean's testimony is based on possibilities rather than on probabilities. On the other hand the only testimony of probative value fixing the causation was that psychic trauma probably set in motion the thrombosis that resulted in death.

There were introduced in evidence two death certificates. The first one signed on the date of death showed the cause as a brain tumor .On February 18th a corrected death certificate was signed and filed by Dr. Greenwood, stating the disease or condition directly leading to death was "cerebral thrombosis, bilateral posterior due to exertion because of fire in office December 4, 1954;" that injury occurred from trying to save records from burning building.

■ Article 4477, Rule 54a provides that a death certificate properly filed is prima facie proof of the information therein contained. The Court of Civil Appeals says that this death certificate was offered by the petitioners without any limitation whatever and therefore they are bound by its contents. From an examination of the statement of facts there seems to be some confusion. As we read the record the amended certificate was offered in vidence by the respondent; petitioners' objection was overruled. Later, there is a statement by the petitioners to the effect that they offered both. However, we regard this as immaterial. The probativ value of the certificate is destroyed by the positive testimony of the doctors that the thrombosis was probably caused by the mental disturbance, and by the testimony of the doctor who signed the certificate. There is no testimony that exertion produced the thrombosis. The evidence of exertion rises to no more than a scintilla. Joske v. Irvin, 91 Texas 574, 44 S.W. 1059.

Dr. Greenwood who performed the operation upon the insured, recommended the autopsy and signed the amended death certificate, testified in behalf of the respondent in part as follows:

" 'Q. What are, in your medical opinion, the possible causes of Mr. Simmons' thrombosis, possible causes? A. Well, there are things we consider as possible causes. Just the medical causes.

" 'Q. Based upon the history, your examinations, your sur-

gery, and the autopsy, what would be the possible causes of Mr. Simmons' thrombosis? A. I think you would have to divide it into two large groups, it could be where there was no specific cause, where it is congenital, or it could be where you have a severe exertion like at the time of the fire or severe emotional stress and strain might have been instrumental in precipitating the actual thrombosis.

" 'Q. In your opinion, was there sufficient arteriosclerosis to have cause the thrombosis in Mr. Simmons' case? A. I will say ordinarily not, no, sir.

" 'Q. Doctor, do you know what caused Mr. Simmons' thrombosis? A. No, sir.

"Q. Do you have an opinion based upon your tests, examinations, history, surgery and autopsy, as to what possibly caused the thrombosis? A. I don't think I can answer that definitely any more or any further than I already hame. If it can be shown he did undergo severe exertion or extreme emotional strain or received an actual blow or injury, then those things would certainly be considered as factors in the possible precipitation of his thrombosis; other than that, we can just say it happened.' "

The uncertainty and speculation as to the cause of the insured's death cannot be more forcibly described than respondent does in concluding her brief. In summing up she says:

"It is true that no medical man, or any other witness, testified that the fire and resultant emotional stress an dstrain, and the removal of the debris and the setting up of a new office actually did cause the cerebral thrombosis that actually did cause the death of Harrington G. Simmons, when the fire did not have any such effect upon anyone else. It is true, however, that, with the background and factual situation outlined above, the fire in some unexpected and unexplained way did have this effect on him and he died as a consequence of injuries inflicted by accidental means."

There being no evidence that the insured suffered death as a result of bodily injuries effected solely through external, violent or accidental means, recovery of double indemnity benefits must be denied.

The judgments of both courts are reversed and judgment here rendered that respondent take nothing.

Opinion delivered November 23, 1960.

MR. JUSTICE SMITH concurring.

On this the 14th day of November 1960, I have concluded, after further consideration of the record, that petitioners' motion for rehearing should be granted; that the judgments of both the trial court and the Court of Civil Appeals should be reversed, and judgment here rendered for the petitioners. My reasons are expressed in the following opinion:

The primary question this court has for decision is this: Do the facts, impliedly found by the trial court, show that the death of the insured was effected solely or directly and independently of all other causes through "external, violent and accidental means?" That is the real question here, and it should be answered in the negative for the reasons now to be briefly state.

This is a suit wherein Mrs. Elizabeth Cotton Andrews, as Guardian of a designated minor-beneficiary is seeking to recover double indemnity or accidental death benefits on two policies of insurance issued by Pan American and the Continental Assurance Company on the life of Harrington G. Simmons, now deceased.

The policy issued by Pan American contains the following pertinent provision:

"Upon receipt of due proof that the death of the insured occurred in consequence of bodily injuries effected solely through external, violent and accidental means, of which (except in the case of drowning or of internal injuries revealed by an autopsy) there is a visible contusion or wound on the body, and that such death occurred within sixty days after such injury was sustained, and as a direct result thereof, independently of any other cause, * * * the Company will, upon surrender of the policy, in lieu of all other benefits under this policy, pay to the beneficiary or beneficiaries under this policy, subject to the change of beneficiary clause, double the face amount of this policy."

The policy issued by Continental contains substantially the same provision.[1] The conclusions reached as to one would na-

1.—"Upon receipt at its home office in Chicago, Illinois, of due proof that the death of the insured has resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidntal means

turally apply to the other. Both of these contracts of insurance are plain and unambiguous. They provide for double payment only where death results from bodily injuries brought about solely (directly and independently of all other causes) through *external, violent and accidental means.*

Respondent agrees that both of the policy provisions, supra were written to insure against "death by accidental means" rather than "accidental death." The parties are in practical agreement on the evidence. The facts are sufficiently set out in the opinion of the Court of Civil Appeals. Therefore, it is not necessary to detail the facts except as may be necessary for a clearer understanding of the conclusions reached. It is sufficient to point out at this juncture that the court could not from the evidence have impliedly made findings other than:

1. The fire in the insured's office was not the cause or means of his death.

2. The death of the insured resulted from a clot in an artery of the brain.

3. The clot in the artery was an internal bodily injury revealed by the autopsy.

4. 34 days before his death, the insured *witnessed* the destruction of his office and records by fire.

5. The *witnessing* of the fire produced a mental reaction (described as a phychic trauma) which was the *means* through which the clot in the artery was effected.

6. These *means* were entirely mental or psychic, wholly free of and unaccompanied by any physical force."

If the *fire* was not the *means* of the insured's death, then what was? There is no evidence which would give rise to a reasonable inference that the clot in the artery, or the thrombosis, if you choose to so label it, occurred on the day of the

and that said death occurred while said policy and this supplementary contract are in full force and within ninety (90) days from the accident causing such injuries, it will pay to the beneficiary designated in said policy a sum equal to the face amount of the policy. In addition to the amount otherwise payable under the said policy.

"This supplementary contract does not cover death resulting from:

"(a) Bodily injuries of which there is no visible contusion or wound on the exterior of the body, except in case of drowning or internal injuries revealed by an autopsy."

fire, neither does the record show anything other than the fire which could be "external, violent and accidental." These plain and unmistakable words in the two policies, in other words, the language of the policies must control. There is no evidence that Mr. Simmons died as the consequence of bodily injury effected solely through external, violent and accidental means producing a visible contusion or wound on the exterior of the body, drowning, or internal injuries revealed by autopsy.

The policies do not provide recovery for accidental death where the evidence shows, as here, that the fire at best was only a contributing cause, causing a purely mental reaction upon the insured. The policies simply do not afford coverage where the cause of death was an unanticipated reaction to the insured's environment. There is no casual relationship between the claimed *bodily injury* as the result of witnessing the fire and Mr. Simmons' death. The most that can be said of the medical testimony offered by the petitioner is that the petitioner's doctor testified that the witnessing of the fire by the insured may have caused a psychic trauma and was a possible cause of the insured's death. The doctor for the respondent stated, in effect, that there was a reasonable probability that psychic trauma was caused by witenssing the fire, which caused the insured's death. This testimony does not constitute any evidence that the sole cause of the insured's death was by violent, external and accidental means.

It should be noted that double indemnity coverage is provided in both policies for *bodily* injuries only. It is clear from the evidence that the image or contents of the insured's brain and nervous system was not the sole efficient cause, independent of all other means or causes of the cerebral arterio-thrombosis; but that the sole cause of his death came about as the result of the intervening agency of his mind and nervous system working on the image, which was an *entirely internal means*, and, therefore, not external.

The poison, inhalation and sunstroke cases are those where there was physical trauma which could be traced into the insured's body and which was the sole and proximate cause of the insured's death without the intervention of any other cause. In the present case, there is no physical trauma which can be traced into the insured's body as the sole cause of the insured's death, without the intervention of any other casual means. The respondents have failed to discharge the burden resting upon them to prove that the death of Mr. Simmons resulted solely or directly and independently of all other causes from external, violent and accidental means.

The judgments of both courts should be reversed and judgment rendered that respondents take nothing. Accordingly, I concur in the opinion of the Court delivered on the 23rd day of November 1960.

Opinion delivered November 23 ,1960.

MR. JUSTICE CALVERT, joined by JUSTICES WALKER AND NORVELL AND CHIEF JUSTICE HICKMAN, dissenting.

An opinion substantially as set out below was adopted and handed down as the opinion of the majority of this court on April 6, 1960, in connection with its judgment affirming the judgment of the Court of Civil Appeals. Petitioner's motion for rehearing was overruled by a reduced majority on October 5, 1960. A majority have now concluded that the judgments of the Court of Civil Appeals and the trial court should be reversed and judgment here rendered for petitioner. My views of the case and concerning a proper decision of the questions in the case remain the same as when they were expressed as the views of the majority in the attached opinion, and I accordingly now file the opinion as a dissent.

Suits by Mrs. Elizabeth Cotton Andrews as guardian of a designated minor-beneficiary in policies of insurance issued by Pan American Life Insurance Company and Continental Assurance Company on the life of Harrington G. Simmons were consolidated in the trial court. In the suits recovery was sought from the respective defendants of double indemnity or accidental death benefits. Trial was before the court without the aid of a jury and judgment was rendered for the plaintiff. The Court of Civil Appeals affirmed. 323 S.W. 2d 287.

The wording of the relevant provisions of the two policies is substantially the same. Pan American's policy provides for payment of double the face amount of the policy upon due proof that the death of the insured "occurred in consequence of bodily injuries effected solely through external, violent and accidental means." Continental's policy provides for an additional payment equal to the face amount of the policy upon due proof that death of the insured "resulted from bodily injuries effected directly and independently of all other causes through external, violent and accidental means." Under the plain provisions of each of the policies liability for the additional payment attaches if injuries causing death are internal and are revealed by an autopsy, regardless of whether they leave a visible contusion or wound on the outside of the body.

The insured died on January 7, 1954. An autopsy revealed that his death was caused by a cerebral arterio-thrombosis (a clot in an artery of the brain). There were no visible contusions or wounds on the outside of the body. We granted writ of error because we were of the opinion that the only injury suffered by the insured, having support in the evidence, which could have caused his death was caused by a psychic trauma, and we wished to review the holding of the Court of Civil Appeals that death from that type of injury was effected solely or directly and independently of all other causes through "external, violent and accidental means." A brief statement of some of the relevant evidence is in order.

During the early morning hours of Friday, December 4, 1953 there was a fire on the floor of the building where the insured had an accounting office. There is in the record testimony that so far as was known the origin of the fire was accidental; there is no evidence to the contrary. Before the fire the insured, who was then forty-four years of age, was active, athletic, strong and apparently physically sound. He was seen watching the fire by witnesses who testified that he appeared to be nervous, upset and excited. He appeared to be still very nervous and upset on Saturday and borrowed field glasses in an effort to see into his office. On the same day he was observed favoring his right foot. On Sunday the insured was seen making several trips into and out of his office from the top of an adjoining building, over a firewall, carrying wire baskets full of papers, files, etc. On Monday he dropped one end of a desk he was helping to carry into another office and complained that his arm and leg had been "giving him some trouble in the last day or two." During the interval from about December 8th to December 17th a close friend noted that something was bothering the insured physically and that he was not acting, physically or mentally, as he had before the fire. On the 13th he complained to his sister-in-law of a lack of feeling in the right side of his face and of something wrong with his right leg. On the night of the 17th he complained to a friend that he was not feeling well, and he left a dance early. On the 18th he told his friend he was losing the feeling in one leg and foot. The insured forgot to mail reports which should have been mailed by December 10th, was unable to write a check on the 21st, on the same date drove his automobile against a light pole, which he had failed to see, and dropped a cup of coffee at a party. On the 24th the insured visited his sister-in-law, spilled coffee and parts of his dinner, said he had no feeling in the right side of his face or in his right foot, and could not use his arm very well.

The insured accompanied his minor daughter to the office of his family doctor, Dr. John L. Dean, Jr., on December 5th, and with "a great deal of emotion" told the doctor that the fire had been very, very serious and that the destruction of his records had him in a jam. During a social visit on the 16th the doctor observed that the insured had a noticeable limp in his right leg and arranged a professional appointment for the 17th. Insured related to the doctor that he had had the limp since a day or two after the fire. Examination revealed an extensive lack of feeling in the right leg and right arm, and an appointment was made with Dr. Abe Hauser, a neurologist, for the 22nd. After examination by Dr. Hauser the insured entered a hospital on the 25th.

Much of the medical testimony is set out in question and answer form in the opinion of the Court of Civil Appeals. After the insured entered the hospital, Dr. Hauser called in Dr. James A. Greenwood, Jr., a neuro-surgeon, who operated on the insured on January 4th. Dr. Greenwood testified that a cerebral arterio-thrombosis could result from a congenital condition or that it might be precipitated by emotional stress and strain; that there was surprisingly little arterio-sclerosis in the brain of the insured and that, in his opinion, it was not sufficient to have caused the thrombosis. Dr. Dean testified that, in his opinion, "the thing that set off the chain reaction that produced this condition, was probably psychic trauma;" that "The fire produced the reaction in his mind, which is capable of producing damage to the cells tissue, not only in the brain, but other organs too." Dr. Edward Darsey, in answer to a hypothetical question, gave it as his opinion that there was a reasonable probability that the emotional or psychic trauma suffered by the insured as a result of the fire was the cause of the thrombosis.

The single point of error before this court asserts that there is in the record no evidence of probative force which will support a recovery of double indemnity or accidental death benefits under the provisions of the policies in suit.

The evidence is overwhelming that the autopsy performed on the body of the insured disclosed that he died from a cerebral arterio-thrombosis. The policy does not require that the "means" causing bodily injury be disclosed by autopsy, only that the bodily injury causing death be disclosed thereby. There can be no question but that the thrombosis was internal and that it was disclosed by an autopsy. The evidence above detailed gives rise to a reasonable inference that the thrombosis occurred on

the day of the fire and the testimony of Drs. Dean and Darsey that the thrombosis was probably caused by psychic trauma supports, in law, the trial court's implied finding that psychic trauma did cause the thrombosis and death. Port Terminal Railroad Ass'n. v. Ross, 155 Texas 447, 289 S.W. 2d 220. There is testimony of medical witnesses in the record to the effect that they had never heard of a cerebral arterio-thrombosis being caused by psychic trauma and that they regarded such an occurrence as improbable, but that testimony presented, at most, only a conflict in the evidence. Our jurisprudence has found no better way of resolving conflicts in the testimony of witnesses, even of experts, than through findings by a jury or trial judge. Coxson v. Atlanta Life Ins. Co., 142 Texas 544, 179 S.W. 2d 943.

The difficult question is whether the evidence supports the implied finding of the trial court that the cerebral thrombosis was effected solely or directly and independently of all other causes through external, violent and accidental means. In approaching that question it should be noted at the outset that if death is proximately caused by accidental means it is immaterial that a pre-existing condition of health may have made the body more susceptible to injury; death from injury in that situation, it is held, nevertheless results "solely" or "directly and independently of all other causes" from the injury. Home Benefit Ass'n. of Paris v. Smith, Texas Civ. App., 16 S.W. 2d 357, writ refused; 29A Am. Jur. 351, Sec. 1212. Our inquiry is therefore narrowed to whether the cerebral thrombosis resulting from psychic trauma caused by watching the fire destroy his office and records was effected through "external, violent and accidental means." The problem is, in reality, more one of determining whether the facts impliedly found by the trial court bring the death of the insured within the terms of the policies than it is of determining whether there is evidence of the existence of the facts. The insured was highly nervous and excited from watching a fire, accidental in origin, destroy his office and business records; the excitement generated a psychic trauma which caused a thrombosis in an artery of his brain from which he died. Was his death effected through external, violent and accidental means? The question divides itself into three parts: Was the means of the insured's death external? Was it violent? Was it accidental?

In McGlinchey v. Fidelity and Casualty Co., 80 Me. 251, 14 A. 13, 6 Am. St. Rep. 190, a horse driven by the insured and pulling a carriage in which he and two children were riding

became frightened, nearly collided with other teams, and ran for a considerable distance before being brought under control. The insured became ill immediately and died within an hour. The court accepted the evidence as establishing as a fact that the insured died from a ruptured blood vessel about the heart, and concluded that the rupture was caused by the "extraordinary physical and mental exertion which the deceased put forth to save his children and himself from injury." So concluding, the court had no difficulty in further concluding that the means of death was violent and accidental and held specifically that death was caused by "external means." The court then continued:

"The defendants, however, do not agree to this version of the facts. They contend that death was produced purely by fright, and not by the aid of any physical means whatever, and that the means through which death was produced must be considered as internal only. But if it is to be admitted that death was caused through fright, even then we are just as strongly convinced that it was also caused by external means. * * * If the death be laid to fright, it must be because fright produced bodily injury, and the means which produced fright were external."

While the Court's holding that fright alone would be an external means of death is obviously dictum, we regard it as sound and accordingly hold in the instant case that the death of the insured was effected through external means. The means of death may be external although it acts only internally. 29A Am. Jur. 310, Insurance, Sec. 1165. It is unnecessary to predicate liability under the policy provisions that the physical force which causes death should spend itself against the exterior of the body. In Hanna v. Rio Grande Nat. Life Ins. Co., Texas Civ. App., 181 S.W. 2d 908, 911, writ refused, we approved the following quotation from Vance on Insurance, 2nd. Ed., Sec. 258, page 879: "Thus, poison taken into the system, and operating entirely internally, is nevertheless an external cause, as is the water which causes death by drowning, and gas which causes asphyxiation." In writing their policies petitioners recognized that death could result from external means although the injury causing death was only internal by providing for liability when death was shown by autopsy to have resulted from internal injury although there was no visible contusion or wound on the outside of the body.

We also hold that death of the insured was effected through violent means. "The term 'violent' * * * signifies merely that a physical force, however slight, is efficient in producing the

injury." 45 C.J.S. 784, Insurance, Sec. 754. An unnatural death effected through accidental means imports violence. American Accident Co. v. Reigart, 94 Ky. 547, 23 S.W. 191, 21 L.R.A. 651; 29A Am. Jur. 310, Insurance, Sec. 1165. In keeping with that theory we approved in Hanna, supra, the further statement from Vance, as follows: "Likewise, the term 'violent,' as applied to causes of accidental injury, means merely that the cause is efficient in producing a harmful result. It is not necessary that it shall be violent in the sense of breaking tissues or otherwise physically and visibly affecting the body." The "violent" force of a psychic trauma and its "violent" effect in causing physical bodily injury is settled by our decision in Bailey v. American General Ins. Co., 154 Texas 430, 279 S.W. 2d 315.

There remains the question of whether the death of the insured was effected through "accidental" means. There is great confusion and conflict in the decided cases with respect to whether death in particular fact situations was produced by accidental means. The confusion is caused, largely, by efforts of courts of various jurisdictions to distinguish between "accidental death" and death from "accidental means," see 166 A.L.R. 469-479, and was forecast by Mr. Justice Cardozo in a dissenting opinion in Landress v. Phoenix Mut. Life Ins. Co., 291 U.S. 491, 78 L. Ed. 934, 54 S. Ct. 461, 90 A.L.R. 1382, in which he said the attempted distinction would "plunge this branch of the law into a Serbonian Bog." The courts of many jurisdictions have rejected or repudiated any such distinction. 166 A.L.R. 472. But however that may be, this Court recognized in Bryant v. Continental Casualty Co., 107 Texas 582, 182 S.W. 673, L.R.A. 1916E, 945, that a distinction does exist, and the distinction has been observed, at least in theory, in later decisions by this Court. See International Travelers' Ass'n. v. Francis, 119 Texas 1, 23 S.W. 2d 282; International Travelers' Ass'n. v. Marshall, 131 Texas 258, 114 S.W. 2d 851.

The difficulty in applying the rule when the distinction is observed is no better illustrated than by comparing the Bryant and Landress cases, supra. In Bryant this Court recognized the distinction and, in applying it, held that death of an insured from sunstroke suffered while walking on the streets of Houston was effected through accidental means. In Landress the Supreme Court of the United States also recognized the distinction but, in applying it, held that death of an insured from sunstroke suffered while playing golf was not effected through accidental means. Now, obviously, the location of the insured (upon the street or on the golf course) when the sunstroke occurred is

no sound basis for the differing holdings, as neither is the activity (walking in the pursuit of business or walking in the pursuit of pleasure) in which the insured was engaged. Moreover, both courts purported to apply the same rule; that is, both courts recognized that it was not enough to predicate recovery that death accidentally *resulted* from voluntary exposure to the sun's rays, but that it was necessary that death should have resulted from "accidental means." Both courts reasoned that death from voluntary exposure to the sun's rays is accidental in that it is unusual, unanticipated, unexpected and extraordinary. This Court reasoned that the word "means" as employed in the term "accidental means" is synonymous with "cause," and that since it is not usual or expected that exposure to the sun's rays will cause death it must follow that the cause, or "means," of death was accidental. The Supreme Court of the United States reasoned that the "external means" producing the insured's death was the rays of the sun and found no allegation of anything in the sun's rays which was unexpected or unforeseen.

The decided cases involving facts analogous to the facts in the instant case are few and are not greatly enlightening or entirely satisfactory as precedents. The only cases in which the problem is discussed which our research has discovered, other than McGlinchey v. Fidelity and Casualty Co., supra, are International Travelers' Ass'n. v. Branum, Texas Civ. App., 169 S.W. 389; Provident Life & Accident Ins. Co. v. Campbell, Tenn. App., 79 S.W. 2d 292, and Pierce v. Pacific Mut. Life Ins. Co., 7 Wash. 2d 151, 109 P 2d 322.

In International Travelers' Ass'n. v. Branum, the Court of Civil Appeals held that death from apoplexy—the bursting of a blood vessel in the brain—caused by the excitement of witnessing a man burned to death in an accidental fire, or by a fall produced by the excitement, or by both, was an accidental death and a death caused by accidental means. The judgment of the Court of Civil Appeals was reversed on other grounds by this Court without discussion of the problem. See 109 Texas 543, 212 S.W. 630. In Robinson v. Aetna Life Ins. Co., Texas Com. App., 276 S.W. 900, the court cited the opinion of the Court of Civil Appeals in Branum as a basis for recognizing that there is a distinction between death from apoplexy produced by natural causes or "apoplexy as that term is commonly understood," and death from apoplexy produced by external, violent and accidental means

In Provident Life & Accident Ins. Co. v. Campbell, a Tennessee Court of Appeals, an intermediate appellate court, interpreted the evidence as establishing that death of an insured from a cerebral hemorrhage was caused by a combination of a pre-existing condition of blood vessels in the brain and "mental shock" from running an automobile against a child, and held that death did not result "solely and exclusively" from either cause. The court went on to say by way of dictum that even if the pre-existing disease did not contribute to cause the death it was "of the opinion * * * that a purely 'mental shock' due to excitement or 'mental disturbance' * * * is not a bodily injury within the contemplation of the insurance contracts * * *." The case is of doubtful precedential value even in Tennessee. See Nat. Life & Acc. Ins. Co. v. Follett, 168 Tenn. 647, 80 S.W. 2d 92; North American Ins. Co. v. Ellison, 267 S.W. 2d 115.

Perhaps most closely analogous is Pierce v. Pacific Mutual Life Ins. Co. Suit was on two accident policies which provided for weekly payments as indemnity "Against Bodily Injury sustained * * * solely through accidental means * * *." The evidence established that the insured became badly frightened and "slammed on the brakes" and suffered a cerebral hemorrhage when it appeared that a collision between his automobile and another was inevitable. There was medical testimony that the hemorrhage was caused by a ruptured blood vessel and that "the precipitating cause of the rupture was a combination of the fright and the sudden physical effort then exerted" by the insured. The Supreme Court of Washington stated that one of the questions it was called upon to answer was "whether or not fright, or mental shock, unaccompanied by physical impact, is sufficient to constitute 'accidental means' within the purport of that term as used in the policies." The Court answered the question in the affirmative and upheld a recovery by the insured.

Other cases which are not squarely in point but which are cited by petitioners as persuasive to their point of view are International Travelers' Ass'n. v. Ross, Texas Com. App., 292 S.W. 193 (Death from rupture of a blood vessel in the brain caused by straining while vomiting held to be caused solely by sickness and not by accidental means); Radcliffe v. National Life & Accident Ins. Co., Texas Civ. App., 298 S.W. 2d 213, writ refused, n.r.e (Death from suffocation caused by entry into the lungs of regurgitated or vomited contents of the stomach held to be caused by neither external nor accidental means); Hartford Accident & Indemnity Co. v. Douglass, 5th Cir., 215 F. 2d 201 (Death from ruptured aorta caused by strain of lift-

ing a crate of grapefruit held not to be caused by accidental means).

Other cases which are not squarely in point but which are persuasive to respondent's point of view are Pledger v. Business Men's Accident Ass'n. of Texas, Texas Com. App., 228 S.W. 110 (Death was from rupture of heart vessels caused by lifting bales of cotton. The hazard insured against was "accidental death" rather than death caused by "accidental means." It was held that the death was an "accidental death" because it was caused by "accidental means") ; Ft. Worth Mut. Benev. Ass'n. of Texas v. Miller, Texas Civ. App., 280 S.W. 338 writ dismissed (Death from a ruptured artery in the brain caused by pushing an automobile held to be caused by "accidental means only") ; Home Ben. Ass'n. of Paris, Texas, v. Smith, Texas Civ. App., 16 S.W. 2d 357, writ refused (Death from ruptured blood vessel caused by cranking an automobile held to be "caused by an accident") ; Garrett v. International Travelers' Ass'n., Texas Civ. App., 14 S.W. 2d 944. no writ history, (Death from car- bunclar infection caused by rubbing or picking pimple on nose held to be from "external, violent and accidental means") ; In- ternational Travelers' Ass'n. v. Yates, Texas Com. App., 29 S.W. 2d 980 (Death from administration of gas as anesthetic held to be through "accidental means") ; International Travelers As'sn. v. Francis, 119 Texas 1, 23 S.W. 2d 282 (Death from infection following extraction of a tooth held to be caused "solely and exclusively by external, violent and accidental means") ; International Travelers' Ass'n. v. Bettis, Texas Civ. App., 52 S.W. 2d 1059, writ refused, (Death from blood poisoning from accidental cut on finger held to be caused by "external, violent and accidental means") ; International Travelers' Ass'n. v. Marshall, Texas Civ. App., 94 S.W. 2d 558, reversed on other grounds but holding approved, 131 Texas 258, 114 S.W. 2d 851 (Death from peritonitis caused by fall against a tractor wheel held to be caused through "accidental means") ; Hanna v. Rio Grande Nat. Life Ins. Co., Texas Civ. App., 181 S.W. 2d 908, writ refused, (Death from voluntary taking of a prescribed number of sulfanilamide tablets held to be caused by "external, violent and accidental means") ; Pacific Mut. Life Ins. Co. of California v. Schlakzug, 143 Texas 264, 183 S.W. 2d 709, (Death from infection caused by plucking hair from nostril held effected through "external, violent and accidental means," and also that the infection occurred through "an accidental cut or wound" made by intentionally plucking the hair.)

It is said above that this Court has observed in theory in

a number of cases a distinction between accidental death and death caused by accidental means. The later cases indicate, however, that the distinction is observed more in theory than it is in fact. In Francis, supra, it was held that extraction of the tooth was the *means* of the infection which followed and caused death. Now, obviously, extraction of the tooth was deliberate and not accidental, but death from extraction of the tooth was nevertheless held to be produced by accidental means because the extraction of the tooth had the unexpected and unforseen, and thus accidental, effect of introducing pythogenic organisms into the blood stream. In support of its holding the Court quoted extensively from Cooley's Briefs on Insurance, 2nd Ed., Vol. 6, p. 5234, in part as follows: "* * * an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of such means, an effect which the actor did not intend to produce and which he cannot be charged with the design of producing, is produced by accidental means. * * *" The Court laid particular stress upon the fact that a vis major or act of God was so connected with the extraction of the tooth as to become part and parcel of that act; thus, it was said, the means, although voluntary, took color from the unknown and fatal factor and became accidental. In the course of its opinion the court disclaimed any intention of departing from the rule of the Bryant case.

We refused writ of error in Hanna, supra, thereby making the opinion in that case as authoritative as our own. In that case the Court of Civil Appeals analyzed the Francis opinion at length and said it did not regard that case and Bryant as conflicting, but the court added that if there was conflict Francis was later and should be regarded as authoritative. It also recognized that Francis committed this jurisdiction to "the more liberal rule" that if the death which follows a given voluntary act is such as follows in an unusual and unexpected way the death is produced by accidental means. In support of its conclusion the court cited and quoted with approval from Taylor v. New York Life Ins. Co., 176 Minn. 171, 222 N.W. 912, 60 A.L.R. 959, in which death resulted from administration of a local anesthetic to which the insured's body was hypersensitive. The Minnesota Court held that death was produced by accidental means and said: "* * the weight of authority is to the effect that the term 'accidental' is equally descriptive of means which produce effects which are not their natural and probable consequences, as it is of means which are wholly unexpected." To the same effect, see Seaboard Life Ins. Co. v. Murphy, 134

Texas 165, 132 S.W. 2d 393, and Pacific Mutual Life Ins. Co. v. Schlakzug, 143 Texas 264, 183 S.W. 2d 709.

From the cases reviewed it clearly appears that the distinction once generally recognized between "accidental death" and "death produced by accidental means," as those terms are used in insurance contracts, no longer exists in this state. Now to apply the rule as it has been evolved to the facts of this case.

It is of no consequence whether the fire was accidental in origin or otherwise. The fire was not the *means* of the insured's death. The psychic trauma which resulted from viewing the fire was the *means* or *cause* of his death. The viewing of the fire was no accident; it was voluntary and deliberate. But the viewing of the fire produced a wholly unexpected, unusual and unforeseen catastrophe—a clot in an artery of the brain. And even if we may say that the reaction of extreme excitement flowing from witnessing the destruction of his office and records was not unusual, we are yet compelled to say, on the basis of petitioners' own medical testimony as well as from common knowledge, that the generation of a cerebral arterio-thrombosis from the excitement was an unusual and unforeseen result. It cannot be a logical distinction between the drowning and asphyxiation cases and this case that whereas the external and violent force in those cases entered the body through the nose or the mouth and caused death by injury to other organs of the body the external and violent force in this case entered the body through the eyes and caused death by injury to the brain. We therefore hold that the death of the insured, under the evidence adduced in this case, was effected or produced by accidental means.

The motion for rehearing filed herein by petitioner should be overruled and the judgment of the Court of Civil Appeals should be affirmed.

Opinion delivered November 23, 1960.

Rehearing overruled December 31, 1960.